**Naa Dei NIKOI, et al., Appellants,**

v.

**ATTORNEY GENERAL OF the UNITED STATES.**

**No. 90–5087.**

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 14, 1991.

Decided Aug. 6, 1991.

Rehearing and Rehearing En Banc Denied Sept. 27, 1991.

Charles Gordon, Washington, D.C., for appellants.

Madelyn E. Johnson, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John D. Bates, and R. Craig Lawrence, Asst. U.S. Attys., were on the brief, Washington, D.C., for appellee.

Before BUCKLEY, WILLIAMS, and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge BUCKLEY.

BUCKLEY, Circuit Judge:

Appellants, three siblings, were born in the United States under diplomatic immunity. When they were between two and eight years old, their family moved to Ghana. After absences of between eleven and sixteen years, the children returned to the United States for college (or, in one case, after college) and applied for registration as permanent residents by virtue of their birth. The Immigration and Naturalization Service denied their applications on the ground that they had abandoned their residence in this country. The Nikois sued in federal district court, lost on summary judgment, and filed this appeal. As the INS action was not arbitrary, capricious, or contrary to precedent, we affirm.

## I. BACKGROUND

### A. Factual

Amon and Gloria Nikoi, who were Ghanaian citizens, had three children while living in the United States. Naa Dei was born in 1960 in New York City, where her father served as a diplomatic official assigned to Ghana's United Nations delegation. In 1961 Mrs. Nikoi took a diplomatic post at the Ghanaian Embassy, and the family moved to Washington. There, two more children were born: Nii Kote in 1962, and Nana Tiaa in 1966.

In early 1969 Mrs. Nikoi was transferred to the Foreign Office, and the family moved to Ghana. Although the parents did not expect to live in the United States again, they kept their house in Washington because they believed that their children would ultimately return here to live permanently. Underlying this expectation was the belief that their children were, by virtue of birth on American soil, citizens of the United States.

On this point, the parents were mistaken. The Constitution confers citizenship on "[a]ll persons born or naturalized in the United States, *and subject to the jurisdiction thereof.*" U.S. Const., amend. XIV, § 1 (emphasis added); *see also* 8 U.S.C. § 1401(a) (1988). The jurisdiction clause "was intended to exclude from its operation children of ministers ... of foreign States born within the United States." *The Slaughter–House Cases*, 83 U.S. (16 Wall.) 36, 73 (1873); *see also United States v. Wong Kim Ark*, 169 U.S. 649, 693 (1898). Because one parent was a foreign official with diplomatic immunity when each child was born, the births did not confer United States citizenship.

The Nikoi children returned to the United States in the 1980's: Naa Dei in 1985, after graduating from Carleton College in Ottawa, Canada, with an honors degree in chemistry; Nii Kote in 1980 to attend Amherst College, from which he graduated in 1985; and Nana Tiaa in 1984 to attend Mount Holyoke College, from which she graduated in 1988 with honors in chemistry. All three have resided in the United States since their return.

Naa Dei learned in 1981 that she was not an American citizen; the younger children made the same discovery in 1985. In late 1987, the three Nikois applied to the Immigration and Naturalization Service ("INS") for Alien Registration Receipt Cards, asserting that they were permanent residents of the United States by virtue of birth.

### B. Regulatory

The Nikois base their claim on two INS cases, *Matter of Huang*, 11 I. & N. Dec. 190 (R.C.1965), and *Matter of Chu*, 14 I. & N. Dec. 241 (R.C.1972), and on section 101.3 of the INS regulations, 8 C.F.R. § 101.3 (1991). In *Matter of Huang*, two American-born children of a Chinese diplomat applied for permanent resident status. The Regional Commissioner noted that they had never left the United States, that they had "grown up as a part of our American popu-

lation," and that they were "not amenable to deportation." 11 I. & N. Dec. at 190–91. Accordingly, he denied the applications for permanent residence on the ground that the petitioners already had the status they sought and ordered that they "be considered to be lawful permanent residents of the United States." *Id.* at 191–92.

*Matter of Chu* dealt with the same issue. The petitioner had been born in the United States under diplomatic immunity, and he had never left the country. 14 I. & N. Dec. at 241. In the course of changing his mother's visa status, the INS had changed petitioner's too, "apparently not realizing that the applicant was entitled to status as a permanent resident of the United States." *Id.* at 242. Because this step had been taken in violation of INS procedures, the Regional Commissioner concluded that it had been ineffective; "the applicant has never lost his status derived at birth as a lawful permanent resident alien." *Id.* at 243. The Commissioner ordered that the "application for creation of a record of lawful permanent residence be denied" and that "the applicant be considered to be a lawful permanent resident of the United States from the date of his birth." *Id.*

In 1982, the INS issued regulations codifying *Huang* and *Chu.* Citing those cases and other authorities, the agency explained that "it has been the stated Service policy for the past thirty-five years" to treat children born in the United States to foreign diplomats as permanent residents. Final Rule, 47 Fed.Reg. 940, 940 (1982). "Until now, however, there was no procedure for creation of records of their lawful permanent residence." *Id.* The new regulations set forth such a procedure.

The principal regulation stipulates that someone born under diplomatic immunity on American soil "may be considered a lawful permanent resident at birth." 8 C.F.R. § 101.3(a)(1). Because such a person "is not subject to the jurisdiction of the United States, his/her registration as a lawful permanent resident ... is voluntary." *Id.* § 101.3(c). The eligibility, however, does not extend indefinitely:

> To be eligible for lawful permanent resident status ..., an alien must establish that he/she has not abandoned his/her residence in the United States. One of the tests for retention of lawful permanent resident status is continuous residence, not continuous physical presence, in the United States. Such a person will not be considered to have abandoned his/her residence in the United States solely by having been admitted to the United States in a nonimmigrant classification ... after a temporary stay in a foreign country or countries on one or several occasions.

*Id.* § 101.3(d). Another regulation requires an alien wishing to register as a permanent resident to submit various documents, including a waiver of diplomatic rights and proof of continuous residence in the United States. *Id.* § 264.2(c)(2); *see also id.* § 101.4. It adds that the status, if granted, "will be recorded as of his/her date of birth." *Id.* § 264.2(g)(2). The agency enacted the regulations without notice and comment, "[b]ecause these additions to the regulations are purely procedural in nature, and implement existing interpretations." 47 Fed.Reg. at 940.

C. Procedural

In December 1987, the Nikois applied under section 264.2(c) for Alien Registration Receipt Cards based on their claim of permanent resident status under section 101.3(d). Their applications were denied the following April and May by the INS District Director in Arlington, Virginia. In doing so, he cited a case in which the Board of Immigration Appeals had ruled that a parent's intentional abandonment of permanent resident status is to be imputed to an unemancipated child. *Matter of Zamora,* 17 I. & N. Dec. 395, 396–97 (B.I.A.1980). The director noted that the Nikois were under their parents' custody and control at the time of their departure from the United States. He concluded in Naa Dei's case:

> Here the applicant, after deriving lawful permanent residence status at birth on July 21, 1960, has been absent from the United States an aggregate period of at least eleven (11) years. Her return after

her initial 11 year absence was not from a temporary visit abroad. She entered as a nonimmigrant visitor for pleasure. Her principal residence, as that of her parents, is Ghana, where she returned with her parents in January 1967 when her mother's assignment to the Ghanian Embassy was terminated.

In conclusion, absent a showing that her lengthy absence from the United States was of a temporary nature, the applicant must be considered to have abandoned the lawful permanent resident status derived at birth.

Appendix for Appellants ("App.") 19. The district director used nearly identical language in the other two cases.

The Nikois moved for reconsideration. Each of the children and their father filed a declaration that described the longstanding plan for the children to return to the land of their birth. In May 1989, a new district director denied the motion on the ground that the Nikois had "failed to submit any evidence justifying a reversal of the initial decision." App. 34. This director, however, disagreed with his predecessor on one point. Whereas the first director had spoken of the Nikois as "deriving lawful permanent residence status at birth," App. 19, the second asserted that "there is no automatic accordation of permanent resident status at birth"; instead, "the circumstances of [the alien's] birth create[ ] eligibility for status as [a] permanent resident, eligibility which turns into fact only upon application to, and recognition by, the Service," App. 33.

Although the two district directors differed in their characterization of the right the Nikois had acquired at birth, they agreed that it had been abandoned. In rejecting the motion for reconsideration, the second director noted that in determining whether residence had been abandoned, it was necessary to consider all of the relevant facts, of which "the most prominent ... is the actual term of absence from the United States." App. 33–34. He then explained:

While continuous physical presence is not required, continuous residency is. Continuous residency is not defined, but it is apparent from the context of the term ... that it implies actual physical presence in the United States ... with only incidental, and temporary absences abroad, where during such absences there is an evident intent to return to the United States.... For the purpose of this consideration, the actual domicile of the child is looked to.

*Id.* at 34. In concluding that the Nikois had abandoned their eligibility for permanent resident status, he observed that the Nikois had "spent all of the tender years of [their lives] abroad." App. 34.

The Nikois challenged the INS decision in district court. In January 1990, the court (Penn, J.) granted the government's motion for summary judgment. This appeal followed.

## II. DISCUSSION

We review grants of summary judgment de novo. *See Shields v. Eli Lilly & Co.*, 895 F.2d 1463, 1465–66 (D.C.Cir. 1990). We owe substantial deference, however, to the INS. We are bound not only by the arbitrary-capricious standard of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A) (1988), but by our recognition that "the power over aliens is of a political character and therefore subject only to narrow judicial review." *Hampton v. Mow Sun Wong*, 426 U.S. 88, 101–02 n. 21, 96 S.Ct. 1895, 1904–05 n. 21, 48 L.Ed.2d 495 (1976); *see* L. Tribe, American Constitutional Law § 5–16, at 358 (2d ed. 1988). Deference, of course, has its limits: Like other agencies, the INS must abide by the procedural dictates of the APA. *See Mada–Luna v. Fitzpatrick*, 813 F.2d 1006, 1011–12 (9th Cir.1987).

Based on the evidence in the record, both district directors found that the prolonged absence of the Nikois from the United States evidenced an intention to abandon their residence in the United States; and, in both decisions, the directors relied on precedent or legal principles that impute a parent's abandonment of residence to a minor child who is within the parent's custody and control. In the initial decision, the

district director cited *Matter of Zamora,* which held that the "voluntary and intended abandonment by the mother is imputed to the applicant." 17 I. & N. Dec. at 396. "When she abandoned her lawful permanent resident status, the applicant also lost his." *Id.* at 397.

In rejecting the Nikois' motion for reconsideration, the second district director summed up his discussion of section 101.-3(d)'s continuous residency requirement by equating it with domicile: "For the purpose of this consideration, the actual domicile of the child is looked to." App. at 34, 38, 42. As the Supreme Court recently noted, the domicile of minors is determined by that of their parents. *See Mississippi Band of Choctaw Indians v. Holyfield,* 490 U.S. 30, 48, 109 S.Ct. 1597, 1609, 104 L.Ed.2d 29 (1989); *see also Yarborough v. Yarborough,* 290 U.S. 202, 211, 54 S.Ct. 181, 185, 78 L.Ed. 269 (1933); Restatement (Second) of Conflict of Laws § 22(1) (1969) ("A minor has the same domicil as the parent with whom he lives.").

In rebuttal, the Nikois highlight a difference between the INS and the State Department. The Department's Foreign Affairs Manual stipulates that the American-born child of a foreign diplomat retains resident status even after leaving the United States because "it must be presumed that the child's residence abroad with the parents (however extended) was beyond the child's control and did not evidence an intent to abandon resident status." Department of State, 9 Foreign Affairs Manual § 42.22, PN4 (Feb. 27, 1989). The Nikois contend that the INS should have followed this "authoritative document." Brief for Appellants at 29.

 Under the Immigration and Nationality Act, the Attorney General has primary but not exclusive power over aliens. The statute provides:

> The Attorney General shall be charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens, except insofar as this chapter or such laws relate to the powers, functions, and duties conferred upon the President, the Secretary of State, the officers of the Department of State, or diplomatic or consular officers: *Provided, however,* That determination and ruling by the Attorney General with respect to all questions of law shall be controlling.

8 U.S.C. § 1103(a) (emphasis in original); *see Abourezk v. Reagan,* 785 F.2d 1043, 1047 (D.C.Cir.1986), *aff'd by an equally divided Court,* 484 U.S. 1, 108 S.Ct. 252, 98 L.Ed.2d 1 (1987). The State Department is charged with "the determination of nationality of a person not in the United States," 8 U.S.C. § 1104(a)(3); the Department and its Bureau of Consular Affairs are authorized to grant or refuse visas, *see id.* § 1104(a)(1). Once an alien reaches the United States, however, he falls within the jurisdiction of the Attorney General, who is not bound by any determination that may have been made by the State Department. *See Cartier v. Secretary of State,* 506 F.2d 191, 197 (D.C.Cir.1974), *cert. denied,* 421 U.S. 947, 95 S.Ct. 1677, 44 L.Ed.2d 101 (1975); *cf.* 8 U.S.C. § 1255(a) (authority of Attorney General to adjust status of alien in the United States to permanent residence). Acting under his statutory authority to do so, *see* 8 U.S.C. § 1103, the Attorney General has delegated to the INS the task of formulating regulations to enforce the Act, *see* 8 C.F.R. § 2.1.

We are dealing here with three aliens currently living in the United States who claim a right to permanent resident status. As this matter clearly falls within the jurisdiction reserved to the Attorney General, and as we are faced with regulations issued by the INS pursuant to authority delegated by the Attorney General, we conclude that the State Department's interpretation is not controlling.

 As a further argument against the agency's decision, the Nikois point to the shift in the district directors' characterization of the thing abandoned: The first spoke of permanent resident status as attaching at birth; the second, of eligibility at birth. The Nikois maintain that the second decision deviated from agency precedents in this respect and should there-

fore be disregarded. They read a substantive significance into the distinction between status and eligibility at birth by likening the former to citizenship. Having done so, they argue, on the authority of *Perkins v. Elg*, 307 U.S. 325, 59 S.Ct. 884, 83 L.Ed. 1320 (1939), that the status cannot be lost during the possessor's minority as a result of the parents' relinquishment of permanent residence.

*Perkins* dealt with the status of a person who had been born in New York of naturalized parents. She was taken to Sweden as a four-year-old, and in time her parents resumed their Swedish citizenship. Although she had become a Swedish citizen by operation of Swedish law, she returned to the United States shortly after attaining her majority and was admitted as a citizen. Her citizenship, however, was subsequently challenged, and she was threatened with deportation. *Id.* at 327–28, 59 S.Ct. at 886–87. The Supreme Court held that

> [i]t has long been a recognized principle in this country that if a child born here is taken during minority to the country of his parents' origin, where his parents resume their former allegiance, he does not thereby lose his citizenship in the United States provided that on attaining majority he elects to retain that citizenship and to return to the United States to assume its duties.

*Id.* at 329, 59 S.Ct. at 887. After stating that that principle was "a necessary consequence of the constitutional provision" bestowing citizenship on a person born in the United States and subject to its jurisdiction, *id.* at 334, 59 S.Ct. at 889, the Court concluded:

> To cause a loss of that citizenship ..., there must be voluntary action and such action cannot be attributed to an infant whose removal to another country is beyond his control and who during minority is incapable of a binding choice.

*Id.* Seizing on this last statement, the Nikois argue that as in the case of citizenship, an intent to abandon permanent resident status may not be attributed to a minor.

We are unpersuaded. *Perkins* concerns the constitutional entitlement of citizenship, which carries with it constitutional protections. *Compare Afroyim v. Rusk*, 387 U.S. 253, 268, 87 S.Ct. 1660, 1668, 18 L.Ed.2d 757 (1967) (referring to an individual's *"constitutional right* to remain a citizen in a free country unless he voluntarily relinquishes that citizenship") (emphasis added), *with* 8 U.S.C. § 1101(a)(20) (defining "lawfully admitted for permanent residence" as "the *privilege* of residing permanently in the United States as an immigrant in accordance with the immigration laws") (emphasis added). The Nikois have pointed to no precedent that suggests that a right to permanent resident status is comparable to citizenship.

Based only on the arguments before us, the distinction between status at birth and eligibility at birth appears in this context to be more metaphysical than substantive. Either way, it is conceded that a person born in the United States of a diplomatic parent has a right to permanent resident status that accrues at birth. It is also agreed that that right is retained only so long as the alien "has not abandoned his/her residence in the United States." 8 C.F.R. § 101.3(d). Thus, whatever the precise nature of the right claimed by the Nikois, the only question before us is whether the district directors correctly found that it had been abandoned. We conclude that they did.

The Nikois contend, finally, that the agency has misconstrued its own regulation. The principal regulation cites continuous residence as "[o]ne of the tests for retention of lawful permanent resident status," 8 C.F.R. § 101.3(d); the Nikois assert that this language leaves room for other tests, one of which might be more generous to people in their position. True enough. But, from the fact that the agency could permissibly apply other tests, it does not follow that the INS abused its discretion by applying the test set forth in the regulation.

Under the circumstances, we can find no basis for concluding that the INS has acted arbitrarily, capriciously, or contrary to law

in concluding that the three Nikois had abandoned their permanent residence in the United States, thereby forfeiting their right to permanent resident status.

### III. Conclusion

The INS and the district court ruled that, as evidenced by their extended absence from the United States while minors in the custody and control of their parents, the Nikois had abandoned their claim to permanent resident status. This conclusion comports with INS precedents, the regulations that codify them, and the general law governing the permanent residence of unemancipated minors. The district court's ruling is therefore

Affirmed.