**CENTER FOR AUTO SAFETY, et al., Appellants,**

v.

**The FEDERAL HIGHWAY ADMINISTRATION, Appellee.**

**No. 90–5310.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 8, 1991.

Decided Feb. 19, 1992.

Henry M. Jasny, Washington, D.C., for appellants.

D. Bruce La Pierre, Atty., Dept. of Justice, with whom Stuart M. Gerson, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty., and Barbara C. Biddle, Atty., Dept. of Justice,

Washington, D.C., were on the brief, for appellee.

Before EDWARDS and RUTH BADER GINSBURG, Circuit Judges, and THOMAS, Circuit Justice.*

Opinion for the Court filed by Circuit Justice THOMAS.

THOMAS, Circuit Justice:

Before 1988, regulations provided without exception that the states must inspect their respective highway bridges at least every two years. The Federal Highway Administration then amended the regulations (1) to authorize less frequent inspections in certain limited circumstances and (2) to require the inspection of bridges' underwater supports at least every five years. The appellants here, two individuals and an organization devoted to the cause of highway safety, challenged both provisions. The questions presented are whether the FHWA has violated its statutory obligation to "establish" by regulation a "maximum time period between inspections," 23 U.S.C. § 151(b)(2) (1988), and whether the agency acted arbitrarily and capriciously in promulgating either amendment.

I

Title 23 U.S.C. § 151(a) requires the Secretary of Transportation to establish "national bridge inspection standards" to provide for "the proper safety inspection and evaluation of all highway bridges." Section 151(b) imposes various minimum requirements that the inspection standards must satisfy. Section 151(b)(2), the focus of much of this controversy, provides that the standards must "establish the maximum time period between inspections." The Secretary has delegated his section 151 responsibilities, among others, to the Federal Highway Administration. *See* 23 C.F.R. § 1.37 (1991).

In 1971, the FHWA promulgated the bridge inspection standards required under

* Justice Thomas was a member of this court when the case was briefed and argued and to-

day has been designated a Circuit Justice of this court. *See* 28 U.S.C. §§ 42, 43(b).

section 151. *See* 36 Fed.Reg. 7851. As codified, section 650.305(a) of the standards declares categorically that "[e]ach bridge is to be inspected at regular intervals not to exceed 2 years." 23 C.F.R. § 650.305(a). Between 1971 and 1988, all bridges subject to the program[1] were inspected at least every two years, but few states inspected their bridges' underwater supports.[2]

In 1988, the FHWA amended the bridge inspection standards in two respects relevant here. First, it promulgated a new section 650.305(c), which permits the states to apply for, and the agency to approve, bridge-specific exemptions from the two-year inspection rule. Section 650.305(c) provides:

> The maximum inspection interval may be increased for certain types or groups of bridges where past inspection reports and favorable experience and analysis justifies [sic] the increased interval of inspection. If a State proposes to inspect some bridges at greater than the specified 2–year interval, the State shall submit a detailed proposal and supporting data to the Federal Highway Administrator for approval.

23 C.F.R. § 650.305(c).

In its notice of proposed rulemaking, the FHWA justified section 650.305(c) as a means of providing the states "greater flexibility with which to utilize available inspection resources in a cost-effective manner." National Bridge Inspection Standards, 52 Fed.Reg. 11,092, 11,094 (pro-posed Apr. 7, 1987). Savings in bridge inspection costs, the agency reasoned, could be redirected into equally important bridge replacement programs. The FHWA acknowledged no safety tradeoff between less frequent inspections and more frequent replacements; instead, it asserted that the two-year inspection interval "can be increased for some categories of bridges with only a minimal or negligible increase in risk to the public." *Id.* This reasoning reflected a change in policy since 1984, when the FHWA had concluded that the safety benefits of a strict two-year rule "far outweigh" the potential economic benefits of less frequent inspections. 49 Fed. Reg. 17,039, 17,040. In justifying the change, the FHWA cited with scant elaboration its "further review and analysis since April of 1984." 52 Fed.Reg. at 11,-093; *see also* National Bridge Inspection Standards, 53 Fed.Reg. 32,611, 32,611 (1988) (citing further analysis of [bridge inspection] data).[3]

The 1988 amendments also added to section 650.303 a new subsection (e), which now provides special inspection procedures for certain categories of bridges. In particular, for bridges with "underwater members," it requires that "[t]hese members" be inspected at least every five years. *See* 23 C.F.R. § 650.303(e)(2).[4] This five-year rule for underwater inspections codifies the interval suggested by the American Association of State Highway and Transportation

---

1. As originally enacted, the inspection program applied only to bridges on the federal-aid highway system. *See* Federal–Aid Highway Act of 1968, Pub.L. No. 90–495, § 26, 82 Stat. 815, 829. In 1978, however, Congress extended the program to all of the nation's approximately 577,-000 highway bridges. *See* Surface Transportation Assistance Act of 1978, Pub.L. No. 95–599, § 124, 92 Stat. 2689, 2705.

2. *See Bridge Safety: Hearings Before the Subcomm. on Investigations and Oversight of the House Comm. on Public Works and Transportation,* 100th Cong., 1st Sess. 17–18 (1987) [hereinafter *Bridge Safety Hearings* ] (testimony of Jim Burnett, Chairman, National Transportation Safety Board).

3. The agency also noted that the 1988 amendments, unlike the proposal withdrawn in 1984, contained various other provisions strengthening the bridge inspection requirements.

4. In pertinent part, § 650.303(e) provides:

> The individual in charge of the organizational unit that has been delegated the responsibilities for bridge inspection, reporting and inventory shall determine and designate on the individual inspection and inventory records and maintain a master list of the following:
>
> . . . .
>
> (2) Those bridges with underwater members which cannot be visually evaluated during periods of low flow or examined by feel for condition, integrity and safe load capacity due to excessive water depth or turbidity. These members shall be described, the inspection frequency stated, not to exceed five years, and the inspection procedure specified.

Officials (AASHTO), an organization that has developed a wide range of suggested highway safety standards. *See* AASHTO, *Manual for Maintenance Inspection of Bridges* § 2.4.2 (1983). The FHWA explained:

> [T]he collective best judgment of professional bridge, hydraulic and geotechnical engineers as expressed by the current AASHTO Guide for Bridge Maintenance Inspection and comments received regarding this rulemaking procedure is that strong underwater inspection programs which encompass all bridges over waterways are currently needed. The 5 year maximum between underwater inspections is appropriate until a sufficient national data base to alter the period is established and evaluated.

53 Fed.Reg. at 32,614.

Unhappy with both provisions, two of the current appellants (among others) petitioned the FHWA for reconsideration. The FHWA denied the petition.[5] In explaining its decision with respect to section 650.-305(c), the agency stated that its post–1984 review had included consideration of two recent draft studies on the deterioration rates of various bridges. Neither of these drafts, however, was entered into the formal record maintained by the agency during the rulemaking.

The appellants sought declaratory and injunctive relief in the district court. They raised three claims: first, that the availability of temporally unbounded exemptions from the general two-year inspection rule violates 23 U.S.C. § 151(b)(2); second and third, that both the exemption provision and the five-year rule for underwater inspections were promulgated arbitrarily and capriciously, in violation of section 10(e)(2)(A) of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

The parties disputed the subsidiary question of what constitutes the administrative record subject to review. The FHWA filed with the district court the two drafts cited in its denial of reconsideration, together with a draft of a third bridge deterioration study. Attached to the studies was a declaration asserting that the agency had considered all of them during the rulemaking.[6] The FHWA also filed a declaration explaining how it typically maintains its rulemaking records. According to that declaration, the "formal Administrative Record" includes materials such as notices published and comments received, but it excludes less formal materials such as "draft reports." [7]

The parties filed cross-motions for summary judgment. The district court denied the plaintiffs' motion and granted the agency's, rejecting each of the plaintiffs' claims and upholding both of the challenged provisions. *See Center for Auto Safety v. Federal Highway Admin.*, Civ. No. 89–1941, 1990 WL 116853 (D.D.C. July 30, 1990). The plaintiffs renew their claims on appeal.

## II

Summary judgment is appropriate if the district court record reveals no "genuine issue" of "material fact." *See* Fed.R.Civ.P. 56(c). An asserted factual dispute is "material" if its resolution could affect the outcome of the case and "genuine" if a reasonable trier of fact could resolve it in favor of the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). We review grants of summary judgment *de novo*. *See Nikoi v. Attorney Gen.*, 939 F.2d 1065, 1068 (D.C.Cir.1991).

Under well-settled administrative law principles, the district court was obliged to afford the challenged agency actions a fair degree of deference, as are we. In reviewing a regulation challenged

---

**5.** *See* Letter from Robert E. Farris, Federal Highway Administrator, to Clarence M. Ditlow III, Executive Director, Center for Auto Safety (Mar. 21, 1989), *reprinted in* Admin.Docket No. 87–10, index no. 7 (on file with FHWA).

**6.** *See* Declaration of Daniel S. O'Connor at 2, *Center for Auto Safety v. Federal Highway Ad-*

*min.*, Civ. No. 89–1941 (filed in D.D.C. Nov. 21, 1989).

**7.** *See* Declaration of Michael J. Laska at 2–3, *Center for Auto Safety v. Federal Highway Admin.*, Civ. No. 89–1941 (filed in D.D.C. July 12, 1990).

under a statute that the promulgating agency is entrusted to administer, we must accept any reasonable interpretation of the statute, *see, e.g., Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984), or the regulation, *see, e.g., Martin v. Occupational Safety & Health Review Comm'n,* —— U.S. ——, 111 S.Ct. 1171, 1175–76, 113 L.Ed.2d 117 (1991), put forth by the agency in support of the regulation. In reviewing an action challenged as arbitrary and capricious, our task is to determine whether the agency has articulated a rational connection between its factual judgments and its ultimate policy choice, *see, e.g., Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983), and whether the underlying factual judgments are supported by substantial evidence, *see, e.g., Association of Data Processing Serv. Orgs. v. Board of Governors,* 745 F.2d 677, 683–84 (D.C.Cir. 1984) [hereinafter *ADAPSO* ].

### A

█ The regulations cannot be reconciled with 23 U.S.C. § 151(b)(2). Section 650.305(c) authorizes the FHWA to grant permission for states "to inspect some bridges at greater than the [maximum] 2-year interval" established under section 650.305(a). With respect to bridges that qualify for this special treatment, however, the regulations on their face fail to "establish" any "maximum time period between inspections," as required by section 151(b)(2). Section 650.305(c) merely defines the circumstances when a bridge may be exempted from the two-year rule—if a state submits a "detailed proposal" and "supporting data" to the FHWA, and if the FHWA finds that "past inspection reports" and "favorable experience and analysis" justify the proposal. It says absolutely nothing about how frequently a bridge must be inspected once it has qualified for the exemption.

The FHWA, however, reads section 650.-305(c) as implicitly requiring these bridges to be inspected at least every four years.

In support of this potentially saving construction, the agency relies upon both a regulatory preamble and a technical advisory. The regulatory preamble states that "[a] maximum time of 4 years between inspections is suggested" and that "[o]nly under very unique and special circumstances would longer periods be considered for approval." 53 Fed.Reg. at 32,613. The technical advisory declares that although the inspection standards "do[ ] not specify a maximum interval" for bridges exempted from the two-year rule, those intervals "should not exceed 4 years." U.S. Dep't of Transp., Federal Highway Admin., *Technical Advisory: Revisions to the National Bridge Inspection Standards (NBIS)* 3 (1988).

The preamble cannot reasonably be read as establishing a maximum time period between inspections. The preamble states that a four-year interval "is suggested," but that is hardly enough to "establish" the interval as binding in all cases. The preamble also states that longer intervals will be "considered for approval" only under "very unique and special circumstances." But despite the narrowness suggested by the adjective "unique," we cannot imagine why an agency might "consider[ ] for approval" intervals longer than four years in "very unique and special circumstances" unless the agency felt itself authorized, at least in some of those circumstances, to grant the approvals. In short, the language in the preamble is far too weak to "establish" the "maximum time period" required by statute.

The technical advisory uses language strong enough to "establish" a four-year rule, but the advisory itself was promulgated only informally—outside the notice and comment procedures required under 5 U.S.C. § 553. Because the advisory can have no *independent* legal effect, it is relevant only insofar as it suggests a reasonable interpretation of *existing* regulations. But as we have explained, neither section 650.305(c) nor any other provision in the existing regulations can reasonably be interpreted as imposing a four-year rule.

Nothing we say today prevents the FHWA from establishing different inspection intervals for bridges posing different risks of collapse. Nonetheless, if the agency exempts a certain category of bridges from the two-year rule, the agency must also "establish" by regulation an appropriately longer "maximum time period between inspections" applicable to that category. Because section 650.305(c) fails to do this, we hold it fatally inconsistent with 23 U.S.C. § 151(b)(2).

B

We need not address the appellants' alternative contention that section 650.305(c) was promulgated arbitrarily and capriciously. This claim will likely resurface, however, for the FHWA can readily repair the defect we have identified by qualifying the regulation with any "maximum time period" of its choice. We therefore offer a few comments on the arbitrary and capricious challenge, with the hope that our discussion will obviate the need for another remand.

■■■ An agency action is arbitrary and capricious if it rests upon a factual premise that is unsupported by substantial evidence. See ADAPSO, 745 F.2d at 683–84. In this case, the FHWA's justification for section 650.305(c) rests primarily on the factual premise that "the [two-year] inspection interval can be increased for some categories of bridges with only a minimal or negligible increase in risk to the public." 52 Fed.Reg. at 11,094. In support of this premise, the FHWA now cites the three draft bridge deterioration studies. The appellants contend that the studies cannot presently be considered because the FHWA never formally introduced them into the administrative record. We agree.

The APA provides that a court reviewing agency action shall consider "the whole record or those parts of it cited by a party." 5 U.S.C. § 706. Interpreting this provision, the Supreme Court in Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), stated that "review is to be based on the full administrative record that was before the [agency] at the time [it] made [its] decision." Id. at 420, 91 S.Ct. at 825; see also Camp v. Pitts, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."). This requirement applies even in the context of informal agency action. See, e.g., Overton Park, 401 U.S. at 417–21, 91 S.Ct. at 824–26 (informal adjudication).

A "record" is simply "everything ... properly placed in evidence under defined rules of admissibility." Pedersen, Formal Records and Informal Rulemaking, 85 Yale L.J. 38, 64 (1975). According to the FHWA's own testimony, the agency follows a defined, if informal, rule under which "draft reports" are not admitted into the "formal Administrative Record" maintained by the agency. Of course the agency could have maintained less strict evidentiary rules, consistent with the forgiving requirements of notice-and-comment rulemaking procedures, under which the draft studies would have been admitted. But having chosen, for whatever reason, to exclude the three draft bridge deterioration studies at the administrative stage, the FHWA cannot now rely on those same studies to provide the requisite evidentiary support during judicial review. This is a straightforward attempt to create "some new record made initially in the reviewing court," Camp v. Pitts, 411 U.S. at 142, 93 S.Ct. at 1244, which the record requirement prohibits.[8]

C

Finally, the appellants, who desire bridges' underwater supports to be inspected at least every two years, contend that the FHWA acted arbitrarily and capricious-

---

8. Nothing we say today prevents the FHWA from changing its rules, if it should desire, in order to admit informal drafts into its administrative records. Whatever materials the agency admits, however, it must supply to the appropriate reviewing court. Whatever materials the agency excludes, it cannot rely upon for support during judicial review.

ly in requiring only that these inspections occur at least every five years. They advance two somewhat different lines of argument, neither of which we find convincing.

■ First, the appellants attempt to characterize the challenged agency action as a relaxation of prior standards. The unamended regulations, they argue, used to require bridges' underwater supports to be inspected at least every two years. Given the FHWA's increased concern for underwater inspections, *see* 52 Fed.Reg. at 11,094, the appellants assert that the agency failed to explain why it was more than doubling the maximum time period between those inspections. The FHWA counters that the underwater inspection rule provides *more* safety than before, because the unamended regulations used to require *no* underwater inspections.

Section 650.305(a) provides that "[e]ach bridge" must be inspected at least every two years. The appellants contend that absent a rule specifically targeted to inspection of bridges' "underwater members," 23 C.F.R. § 650.303(e)(2), the inspection of those members would be governed by the general two-year requirement imposed by section 650.305(a). Of course this argument presupposes that a "bridge" is defined to include its "underwater members."

The FHWA regulations define a "bridge," in pertinent part, to include any "structure including supports erected over a depression or an obstruction, such as water." *Id.* § 650.301.[9] The appellants apparently read the phrase "supports erected over ... water" to encompass *all* of a support, including its underwater part, if any part of the support extends above the water level (as presumably all bridge supports do). The FHWA, by contrast, must read the phrase "supports erected over ... water" to encompass only that part of a support above the water level.

The appellants advance no argument for why their proposed reading is preferable. Although it is perhaps more natural as a textual matter, we do not find the agency's alternative entirely unnatural. Moreover, the agency's reading draws support from widespread and longstanding historical practice before the 1988 amendments, when few underwater bridge supports were inspected and only fifteen states even had underwater inspection programs. *See Bridge Safety Hearings, supra* note 2, at 17–18 (testimony of Jim Burnett). On balance, we cannot conclude that the agency's interpretation is unreasonable, and we therefore defer to it.

■ Alternatively, the appellants contend that the FHWA acted arbitrarily and capriciously even assuming that the challenged agency action is the imposition, for the first time, of an underwater inspection requirement. In essence, they assert that the agency failed to develop a sufficient factual basis from which to conclude that a five-year interval would ensure an appropriate level of safety. We reject this line of argument because it fails to view the agency's decision in light of the available data.

At the time of this rulemaking, several recent accidents had highlighted "the need for evaluation of the underwater components of many bridges." 52 Fed.Reg. at 11,094. Nonetheless, because underwater inspections had been done so rarely, the FHWA found itself without the sort of "national data base," 53 Fed.Reg. at 32,-614, that might have enabled it to calibrate a finely measured response to the problem. In short, the agency faced a known risk of unknown degree—a common predicament for those charged with developing appropriate safety standards. *See, e.g., American Textile Mfrs. Inst. v. Donovan,* 452

9. Section 650.301 provides:

[A] "bridge" is defined as a structure including supports erected over a depression or an obstruction, such as water, highway, or railway, and having a track or passageway for carrying traffic or other moving loads, and having an opening measured along the center of the roadway of more than 20 feet between undercopings of abutments or spring lines of arches, or extreme ends of openings for multiple boxes; it may also include multiple pipes, where the clear distance between openings is less than half of the smaller contiguous opening.

U.S. 490, 101 S.Ct. 2478, 69 L.Ed.2d 185 (1981). Given "insufficient data" from which to make "a fully informed factual determination," the FHWA was forced, in selecting an appropriate standard, to rely primarily on policy considerations rather than factual ones. *See Ethyl Corp. v. EPA*, 541 F.2d 1, 27 (D.C.Cir.), *cert. denied*, 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976).

An agency confronted with such uncertainty need not predicate its initial response upon a finding that any more vigorous response would be unwarranted. To so hold would impose a dilemma between an obviously disproportionate response (for example, requiring underwater inspections at least every two weeks) and no response at all—at least until enough accidents had occurred to provide substantial evidence regarding an optimal level of response. Instead, an agency has some leeway reasonably to resolve uncertainty, as a policy matter, in favor of more regulation or less. *Compare, e.g., American Textile Mfrs. Inst.*, 452 U.S. at 528, 101 S.Ct. at 2500 (approving more stringent regulation when agency "could not obtain the more detailed confidential industry data it thought essential to further precision"), *with, e.g., State Farm*, 463 U.S. at 51, 103 S.Ct. at 2871 ("[A]n agency reasonably may decline to issue a safety standard if it is uncertain about its efficacy...."). With this principle in mind, we consider the agency's asserted justification for the five-year rule.

As mentioned above, the FHWA recognized both the need for requiring underwater inspections beginning immediately and the impossibility, given the data available to it, of determining an optimal minimum frequency between those inspections. *See* 53 Fed.Reg. at 32,614; 52 Fed.Reg. at 11,-094. Following its frequent practice of drawing upon the expertise of the AASHTO,[10] the FHWA decided to adopt as a preliminary measure the relevant AASHTO standard, which it characterized as the

"collective best judgment of professional bridge, hydraulic and geotechnical engineers." 53 Fed.Reg. at 32,614. Finally, the FHWA promised to educate itself, and to refine the standards, as more data becomes available. *See id.* The appellants do not contend that the agency willfully (or even negligently) ignored information available to it, and they do not question the prominence of the AASHTO in matters of highway safety. They offer no attack against the five-year rule, which enjoys support among safety experts outside the AASHTO,[11] except to assert that the agency was required, as a matter of law, to resolve all doubts in favor of more stringent regulation. It was not.

In short, the FHWA both "examine[d] the relevant data"—what little there was—and "articulate[d] a satisfactory explanation for its action." *State Farm*, 463 U.S. at 43, 103 S.Ct. at 2867. The agency did the best it could with the little information it had, and the arbitrary and capricious standard requires no more than that.

### III

We agree with the district court that this case is properly resolved on summary judgment. We conclude that the court erred insofar as it failed to declare section 650.-305(c) inconsistent with 23 U.S.C. § 151(b)(2) and to enjoin its application on that ground. We also conclude that the court correctly upheld section 650.303(e)(2) against challenge as arbitrary and capricious. Accordingly, we affirm in part, reverse in part, and remand the case to the district court with instructions to remand to the FHWA for further proceedings consistent with this opinion. The agency remains free, of course, to close its rulemaking docket forthwith. But if the agency attempts to cure section 650.305(c), it should make clear what materials will constitute the administrative record, and it

---

**10.** *See, e.g.,* 23 C.F.R. § 625.4 (design standards for highways); *id.* § 645.211 (accommodation of utilities); *id.* § 650.301 (definition of "bridge"); *id.* § 650.303 (bridge inspection procedures); *id.* § 652.13(a) (bicycle routes); *id.* § 660.513(a) (design of defense access roads).

**11.** *See Bridge Safety Hearings, supra* note 2, at 21–22 (testimony of Jim Burnett).

must include any necessary evidentiary support within those materials.

*It is so ordered.*