**Dan E. MOLDEA, Appellant,**

v.

**NEW YORK TIMES COMPANY, Appellee.**

#### No. 92–7065.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 14, 1993.

Decided Feb. 18, 1994.

Roger C. Simmons, Washington, DC, argued the cause and filed the briefs for the appellant.

Bruce W. Sanford, Washington, DC, argued the cause for appellee. With him on the brief were Henry S. Hoberman, and Matthew G. Weber, Washington, DC.

Before: MIKVA, Chief Judge, WALD and EDWARDS, Circuit Judges.

Opinion for the Court filed by Circuit Judge EDWARDS.

Dissenting opinion filed by Chief Judge MIKVA.

HARRY T. EDWARDS, Circuit Judge:

In this appeal, Dan E. Moldea challenges the District Court's grant of summary judgment in favor of the New York Times Company, Inc. ("Times"). *Moldea v. New York Times Co.,* 793 F.Supp. 335 (D.D.C.1992). Moldea is an investigative journalist and the author of the book *Interference: How Organized Crime Influences Professional Football ("Interference")*, in which he argues that the National Football League ("NFL") is tainted by connections to organized crime and professional gambling. Appellee Times published a highly unfavorable review of *Interference* ("the Times review" or "review") in the *New York Times Book Review,* a supplement to the Sunday edition of its daily newspaper.[1] Moldea contends in this suit that the Times review defamed him by assailing his competence as a journalist.

Without permitting either party to conduct discovery, the District Court ruled that the Times review was not actionable in libel because it consisted only of unverifiable statements of the reviewer's opinion of Moldea's book, or of statements that no reasonable juror could find to be false. We reverse and

---

1. The full text of the book review at issue in this case is reprinted in an Appendix to this decision.

remand for further proceedings because the trial court erred in ruling that the Times review could not be defamatory as a matter of law. The review attacks Moldea's competence as a practitioner of his chosen profession, a matter archetypically addressed by the law of defamation. We hold that some of the challenged characterizations of *Interference* are sufficiently factual that a jury could meaningfully determine their truth or falsity. Further, while some of the review's characterizations are irrefutably true and thus not actionable, the accuracy of other statements in the review is sufficiently open to dispute that we cannot hold as a matter of law that no reasonable juror could find them to be false. We express no opinion on the ultimate merits of Moldea's libel claim, but we conclude that it was error for the District Court to dismiss this suit at this stage of the litigation.

Finally, we hold that the trial court erred in ruling that Moldea could not state a claim for false light invasion of privacy because he did not allege the publication of "private information." *Moldea*, 793 F.Supp. at 337. In order to state a claim for false light defamation, a plaintiff need only allege that the defendant published untrue facts concerning the plaintiff that placed him in a false light that would be highly offensive to a reasonable person, not that the defendant published "private" information.

## I. BACKGROUND [2]

Moldea is an investigative journalist who specializes in stories about organized crime. He is the author of numerous magazine and newspaper articles; he also has authored three books in addition to the one at issue in this case: *The Hoffa Wars: Teamsters, Rebels, Politicians and the Mob; The Hunting of Cain: A True Story of Money, Greed and Fratricide;* and *Dark Victory: Ronald Reagan, MCA and the Mob.* Moldea's most recent book is *Interference: How Organized Crime Influences Professional Football,* published in 1989 by William Morrow and Company.

The instant case grows out of a highly critical review of *Interference* that appeared in the New York Times Book Review on September 3, 1989. The review was written by Gerald Eskenazi, a sportswriter for the Times. Moldea contends that, prior to the publication of the Times review, he was a respected writer and his book had excellent prospects of success. He had embarked on a thirteen-city promotional tour for *Interference* which included interviews on two nationally broadcast television programs, and his publisher had ordered second and third printings of the book in anticipation of strong sales. Moldea alleges, however, that the Times review's attack on his work both destroyed public interest in his book and effectively ended his career as an investigative journalist. Appellant further contends that, since the review appeared, he has been unable to interest other publishers in his work or to obtain bookings as a lecturer, activities which formerly provided him with significant income.

On August 24, 1990, Moldea filed suit against the Times alleging defamation and false light invasion of privacy. The Times moved for summary judgment before either party had begun discovery. The Times also moved for a stay of discovery, which was granted. On January 31, 1992, the District Court granted summary judgment in favor of the Times, on the ground that Moldea's claim was not actionable as a matter of law. *Moldea*, 793 F.Supp. at 338.[3]

---

**2.** Our statement of the facts is based on the account given by Moldea in his brief to this court. However, these facts are not relevant to our decision in this appeal, which is based solely on the written contents of *Interference* and the Times review. We express no opinion as to the accuracy of Moldea's portrayal of the facts, but leave these issues to the District Court on remand.

**3.** In a separate order issued the same day, the District Court denied a motion by appellant to amend his complaint, in which he sought to add four causes of action based upon the Supreme Court's decision in *Cohen v. Cowles Media Co.,* —— U.S. ——, 111 S.Ct. 2513, 115 L.Ed.2d 586 (1991). *See Moldea v. New York Times Co.,* 793 F.Supp. 338 (D.D.C.1992). The trial court refused permission to amend on the ground that the amended complaint could not withstand a motion to dismiss and so would be futile. *Id.* Because we remand on other grounds we need not address the claims Moldea sought to add in his amended complaint, but instruct the District

The District Court based its ruling on a finding that the portions of the Times review to which Moldea took exception consisted only of statements of nonverifiable opinion about a literary work, or were so clearly true that no reasonable juror could find them false. Thus, the trial court concluded that it would be meaningless for either party to attempt to prove the statements' truth or falsity before a jury.

In his complaint, Moldea alleged that six specific statements in the Times review had defamed him by accusing him of being an incompetent practitioner of his chosen profession, investigative journalism, and by supporting that accusation with false characterizations of his book. The District Court considered only one of the challenged statements at any length. In this passage Eskenazi, after offering faint praise for some aspects of *Interference*, wrote:

> But there is too much sloppy journalism to trust the bulk of this book's 512 pages— including its whopping 64 pages of notes.

The phrase "too much sloppy journalism" was the focal point of the trial court's decision, and the court adjudged it "a description of a literary work from one's personal perspective." *Moldea*, 793 F.Supp. at 337. The District Court ruled in a perfunctory footnote that each of the remaining portions of the review was "either a supported statement of fact or a nonverifiable opinion." *Id.* at n. 3.

Moldea contends that each of the other five statements he challenges also makes him appear to be incompetent or dishonest, and does so by making statements about his book which are verifiably false. The five additional challenged passages are as follows:

(1) *Mr. Moldea is obsessed, for example, with Joe Namath. [Moldea] says that, as a rookie, the New York Jets' quarterback roomed with 'Joe Hirsch, who wrote a betting line and an inside information sheet on professional sports.'*

> *Heady revelations—except that the courtly Mr. Hirsch happened to be the racing columnist and chief reporter for* The Morning Telegraph (*now* The Racing Form). *He still is. He never picked hors-*

*es, never wrote 'an inside information sheet.' He is, in essence, the writer for the world of horse racing.*

Moldea contends that this passage is verifiably false because page 139 of *Interference* does reveal that Joe Hirsch wrote for *The Morning Telegraph*, and because that publication is in fact "an inside information sheet."

(2) *Mr. Moldea tells as well of Mr. Namath's 'guaranteeing' a victory in Super Bowl III shortly after a sinister meeting in a bar with a member of the opposition, Lou Michaels, the Baltimore Colts' placekicker. The truth is that the pair almost came to blows after they both had been drinking; and Mr. Namath's well-publicized 'guarantee' came about quite innocently at a Miami Touchdown Club dinner when a fan asked him if he thought the Jets had a chance. 'We'll win. I guarantee it,' Mr. Namath replied.*

Moldea argues that this passage is false because his description of the Namath–Michaels meeting on pages 196–99 of his book makes no suggestion that the meeting was anything other than innocent.

(3) *[Moldea] revives the discredited notion that Carroll Rosenbloom, the ornery owner of the Rams, who had a penchant for gambling, met foul play when he drowned in Florida 10 years ago.*

According to Moldea, this passage is verifiably false because page 360 of *Interference* states that Moldea's investigations uncovered new evidence proving that Carroll Rosenbloom was not murdered.

(4) *[Moldea] also offers still another recitation of the 1958 playoff game between the Baltimore Colts, then owned by Rosenbloom, and the New York Giants. The Colts disdained a field-goal attempt in overtime, choosing instead to go for a touchdown after they got close to the goal line. Mr. Moldea's implication is that they wanted to win by more than three points to beat the point spread.*

> *The Colts 'again refused to send in kicker Myhra to end the game' with a field goal, [Moldea] complains. What [Moldea] doesn't state in his text is that Steve*

Court to reconsider those claims in light of our decision in this case.

*Myhra was among the worst place-kickers in the league, having missed three extra points and more than half his field-goal attempts during the season.*

It is true that the *text* of *Interference* does not expressly state that Baltimore's place-kicker was among the worst in the NFL. However, a *footnote* to the book's discussion of the 1958 Colts–Giants playoff game does state that Baltimore had the second-worst field goal percentage in the NFL that year, while their quarterback and running back had very low turnover rates. *Interference,* at 444 n. 1. Based on the fact that *Interference* reveals this information, Moldea argues that a jury could reasonably conclude that this passage in the Times review falsely characterized his book.

(5) *Too bad. For there is some really hot stuff in here, albeit warmed over.*

Moldea contends that this statement can be proven false because rather than being "warmed over," his book contains significant new revelations.

## II. DISCUSSION

We review the District Court's grant of summary judgment *de novo. See, e.g., Nikoi v. Attorney Gen. of United States,* 939 F.2d 1065, 1068 (D.C.Cir.1991). As this case was decided solely on the basis of the written contents of *Interference* and the Times review, we are presented with a pure question of law: whether Moldea can in fact state a claim for defamation. In order ultimately to prevail at trial in this matter, appellant has a number of hurdles to clear. This appeal presents only the limited question of whether it was proper to dismiss his claim at this stage of the litigation.

■ Under District of Columbia law, a statement is defamatory "if it tends to injure plaintiff in his trade, profession or community standing, or lower him in the estimation of the community." *See, e.g., Afro–American Publishing Co. v. Jaffe,* 366 F.2d 649, 654 (D.C.Cir.1966) (en banc); *Vereen v. Clayborne,* 623 A.2d 1190, 1195 n. 3 (D.C.1993). A defendant's statements must also be shown to be false by a preponderance of the evidence—truth is a complete defense to defamation. *See, e.g., Liberty Lobby, Inc. v. Dow Jones & Co.,* 838 F.2d 1287, 1292 (D.C.Cir.), *cert. denied,* 488 U.S. 825, 109 S.Ct. 75, 102 L.Ed.2d 51 (1988).

■ In *White v. Fraternal Order of Police,* 909 F.2d 512 (D.C.Cir.1990), this circuit adopted a framework for defamation actions that tends to track the RESTATEMENT (SECOND) OF TORTS § 614 (1977) ("RESTATEMENT"). The RESTATEMENT provides that, in defamation actions, the court determines "(a) whether a communication is capable of bearing a particular meaning, and (b) whether that meaning is defamatory." RESTATEMENT § 614(1). The jury then determines whether the communication was in fact so understood by its recipient. *Id.* § 614(2).

This circuit's precedents and the apparently unanimous decisions of other courts hold that whether a statement is "capable of conveying a defamatory meaning" is a question of law for the court to determine as a threshold matter. *See, e.g., White,* 909 F.2d at 518; *Tavoulareas v. Piro,* 817 F.2d 762, 779–80 (D.C.Cir.) (en banc), *cert. denied,* 484 U.S. 870, 108 S.Ct. 200, 98 L.Ed.2d 151 (1987); RODNEY A. SMOLLA, LAW OF DEFAMATION § 4.08 n. 132 (1993) ("SMOLLA"); RESTATEMENT § 614.

"Defamatory meaning and falsity are distinct elements of the tort of defamation and are considered separately." *White,* 909 F.2d at 520. Thus, the defamatory meaning inquiry focuses only on whether a reasonable reader could understand a statement as tending to injure a plaintiff's reputation. "It is only when a court can say that the publication is not reasonably capable of any defamatory meaning and cannot reasonably be understood in any defamatory sense that it can rule as a matter of law, that it was not libelous." *Id.* at 518 (quoting *Levy v. American Mutual Ins. Co.,* 196 A.2d 475, 476 (D.C. 1964)); *see also Liberty Lobby v. Dow Jones,* 838 F.2d at 1294 (also citing *Levy* ).

■ Assuming a statement is reasonably capable of a defamatory meaning, the trier of fact must determine if it "was actually understood by the recipient in that sense." *White,* 909 F.2d at 519; *Tavoulareas,* 817 F.2d at 779–80; SMOLLA § 4.08 n. 133; RESTATEMENT

§ 614. The aforecited authorities agree that the intent of the speaker to convey the defamatory meaning is not relevant at this stage of the inquiry, so long as the recipient of the communication reasonably could understand it as such.

■ In the instant case, because the District Court ruled that Moldea could not, as a matter of law, prove falsity, it did not reach the question of whether the Times review was capable of a defamatory meaning. We find, however, that the review clearly is capable of a meaning that would tend to injure Moldea in his chosen profession, investigative journalism—indeed, Moldea alleges that the review did precisely that, and with devastating effect. The allegation that a journalist and author is "sloppy," or that his book's portrayals of central events are incorrect or misleading undoubtedly satisfies the first element Moldea must prove to state a claim for defamation.[4] Thus, we must move on to consider whether the challenged statements are verifiable, and if so, whether a reasonable juror could find them to be false.

A. *Actionable Statements Under* Milkovich *and* White

■ Prior to the Supreme Court's decision in *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990), most courts recognized a strict dichotomy in defamation actions between assertions of opinion and assertions of fact. *See, e.g., Ollman v. Evans,* 750 F.2d 970 (D.C.Cir.1984) (en banc), *cert. denied,* 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985). Under this practice, only false statements of fact could be defamatory; statements of "opinion" could not be defamatory because all such expression was thought to be protected by the First Amendment. As we recognized in *White,* however, *Milkovich* rejected this practice in favor of an analysis that recognizes that statements of opinion can be actionable if they imply a provably false fact. *See White,* 909 F.2d at 522.

In *Milkovich,* a high school wrestling coach argued that an Ohio newspaper libeled him in a column which implied that he had perjured himself in a state court proceeding. The newspaper argued that, because the published material merely expressed the opinion of a writer and not an open accusation of perjury, the column could not be defamatory. The Court, however, squarely refused to recognize a separate constitutional privilege for opinion. *Milkovich,* 497 U.S. at 21, 110 S.Ct. at 2707. Rather, the Court in *Milkovich* held that an "opinion" exception for defamation actions was unnecessary because existing First Amendment principles ensured sufficient protection of speech. Specifically, the Court stated that its decision in *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986), established that, when a plaintiff seeks damages against a media defendant for speech of public concern, there is no presumption that defamatory speech is false. "In other words, the Court fashioned 'a constitutional requirement that the plaintiff bear the burden of showing falsity, as well as fault, before recovering damages.'" *Milkovich,* 497 U.S. at 16, 110 S.Ct. at 2704 (quoting *Hepps,* 475 U.S. at 776, 106 S.Ct. at 1563).

*Milkovich* also held that "loose, figurative, or hyperbolic" statements generally are not actionable in defamation. 497 U.S. at 21, 110 S.Ct. at 2706. However, the special status of these types of expression derives from the constitutional protection provided for parody and other imaginative commentary by decisions such as *Hustler Magazine, Inc. v. Falwell,* 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988), and *Greenbelt Cooperative Pub-*

---

**4.** The record in this case is plainly distinguishable from a case such as *Community for Creative Non–Violence v. Pierce,* 814 F.2d 663, 671 (D.C.Cir.1987), in which we stated that "a suggestion of inaccuracy and of utilizing inadequate research is not defamatory." · In that case, a HUD report insinuated that homelessness statistics compiled by the Community for Creative Non–Violence ("CCNV") were not drawn from systematic evidence. These facts can be distin-guished from those in the present case on two grounds: The HUD report did not make manifest the connection between the inadequacy of prior research and the CCNV's role in that prior research, whereas here, Eskenazi's review obviously is addressed to Moldea's professional competence, and, more importantly, CCNV, unlike Moldea, does not stake its entire reputation on factual accuracy.

lishing Association Inc. v. Bresler, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970), rather than from any separate constitutional protection for "opinion." *Milkovich*, 497 U.S. at 20, 21, 110 S.Ct. at 2706–2707. In addition to examining the specific statements challenged by the petitioner in that case, the Court in *Milkovich* noted that the "general tenor" of the article at issue did not suggest that it was intended to be hyperbolic or figurative. *Id.* at 21, 110 S.Ct. at 2707.

Thus, the Court in *Milkovich* concluded that "the breathing space which freedoms of expression require in order to survive is adequately secured by existing constitutional doctrine without the creation of an artificial dichotomy between 'opinion' and fact." *Id.* at 19, 110 S.Ct. at 2706 (citation and internal quotations omitted). This is so because statements of opinion relating to matters of public concern which do not contain "a provably false factual connotation" will receive full constitutional protection. *Id.* at 20, 110 S.Ct. at 2706; *see also White*, 909 F.2d at 522.

■ In construing the bounds of *Milkovich*, the court in *White* made it clear that "even a *per se* opinion" is actionable if it can "reasonably be understood as implying provable facts." *White*, 909 F.2d at 522. The determination whether a statement should be characterized as factual or as implying provable facts is separate from the "defamatory meaning" inquiry. In *White* we first held that the statements at issue in that case were capable of bearing implied defamatory meanings, then went on to consider whether they were protected by the First Amendment as non-verifiable statements which did not imply provable facts. *See White*, 909 F.2d at 522. The judgment as to whether a challenged statement asserts actionable facts or implies such facts is a question of law for the court to determine as a threshold matter. *See* SMOL-LA § 6.10.

In light of *Milkovich* and *White*, it is now clear that, in a case of this sort, the relevant inquiry is no longer simply whether a challenged statement is "fact" or "opinion." Statements of defamatory fact of course remain actionable (although truth remains a complete defense in defamation actions). The bald statement "Jones is a liar," for example, would plainly fall within the class of factual defamatory statements. *See Milkovich*, 497 U.S. at 19, 110 S.Ct. at 2706. In the case of assertions of "opinion," however, the analysis required by *Milkovich* is more complex. As the Supreme Court held in that case: "expressions of 'opinion' may often imply an assertion of objective fact." *Id.* at 18, 110 S.Ct. at 2705. To illustrate this type of expression, *Milkovich* noted that: "If a speaker says, 'In my opinion John Jones is a liar,' he implies a knowledge of facts which lead to the conclusion that Jones told an untruth." *Id.* Thus, an unsupported statement of opinion that implies defamatory facts can be actionable. *Milkovich* further held that: "Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact." *Id.* at 18–19, 110 S.Ct. at 2705–2706. Just as a speaker is not immunized from liability simply by prefacing otherwise defamatory statements with the words "In my opinion ...," defamatory assessments based on incorrect "facts" stated by the speaker are also actionable. Thus, the statement "In my opinion Jones is a liar because he cheats on his taxes" could be libelous if the allegation of cheating were untrue.[5]

On the other hand, when a writer gives a statement of opinion that is based upon *true* facts that are revealed to readers or which are already known to readers, such opinions generally are not actionable so long as the opinion does not otherwise imply unstated defamatory facts. Because the reader understands that such supported opinions rep-

---

**5.** It is necessary but not sufficient that an allegedly libelous statement imply or state provably false facts. Thus, for example, when a plaintiff seeks damages against a media defendant for speech of a public concern, he or she must prove "fault" in order to prevail at trial. In some cases a plaintiff may also be required to prove that he suffered actual damages as a result of the challenged statements. In the instant case, we do not hold that Moldea has as yet made out his entire claim, or even that he may now present his case to a jury, but only that he has stated a claim that we cannot hold nonactionable at this stage of these proceedings.

resent the writer's interpretation of the facts presented, and because the reader is free to draw his or her own conclusions based upon those facts, this type of statement is not actionable in defamation. *See Phantom Touring, Inc. v. Affiliated Publications*, 953 F.2d 724, 730 (1st Cir.) (contrasting *Milkovich* on the ground that in that case defendant did not reveal factual bases for his opinions and so did not "invite[] readers to draw their own conclusions"), *cert. denied*, — U.S. ——, 112 S.Ct. 2942, 119 L.Ed.2d 567 (1992); *Potomac Valve & Fitting, Inc. v. Crawford Fitting Co.*, 829 F.2d 1280, 1290 (4th Cir.1987) (challenged statement not actionable because its "premises are explicit, and the reader is by no means required to share [defendant's] conclusion"); *Lewis v. Time, Inc.*, 710 F.2d 549, 556 (9th Cir.1983) (no liability for defamation "where a publication sets forth [true facts] underlying its statement that someone is dishonest"). Thus, the statement "In my opinion Jones is a liar because he cheats on his taxes" would not be actionable if Jones had in fact recently been convicted of tax evasion, so long as the statement did not imply additional, unstated bases for calling Jones a liar. While it might be wholly unreasonable to attack Jones' veracity on the basis of his tax returns, a reader would be free to make his or her own assessment of the facts presented.

## B. *Application of the Law to the Facts of this Case*

### 1. "Sloppy Journalism"

■ As we held in *White*, "even a *per se* opinion" is actionable if it can "reasonably be understood as implying provable facts." 909 F.2d at 522. Thus, if the Times review had said nothing more than "Moldea's work is sloppy journalism," this statement would be actionable because it is capable of defamatory meaning, and it reasonably can be understood to rest on provable, albeit unstated, defamatory facts. In levying the charge of "sloppy journalism," it is inescapable that Eskenazi implies *certain* facts—that Moldea plays fast and loose with his sources, that his allegations are not to be believed. Everyone who reads the charge will generally agree on its import.

It is true that whether a book is "sloppy," and indeed whether there is "too much" sloppiness, as Eskenazi stated in his review, may involve an element of subjective evaluation. However, whether an epithet represents a reviewer's "opinion" simply is not dispositive of the question before us. A bare assertion that Moldea is a practitioner of "sloppy journalism" would be precisely analogous to the Supreme Court's example in *Milkovich*: "In my opinion John Jones is a liar." 497 U.S. at 18, 110 S.Ct. at 2705. Although "sloppy" in a vacuum may be difficult to quantify, the term has obvious, measurable aspects when applied to the field of investigative journalism. (Similarly, an accusation of "clumsy hands" may be amorphous in and of itself, but reasonable listeners would agree as to its implications when applied to a brain surgeon).[6] Given that it is defamatory publicly to disparage a person's competence in his chosen field, it simply cannot be the case that a writer may attack a person's work with impunity, and without substantiating his charges with facts, merely by using arguably imprecise terms.

Further, we think it important to make clear that, under the established case law, our analysis of this case is not altered by the fact that the challenged statements appeared

**6.** The dissent attempts to obscure the issue in this case by viewing Eskenazi's "sloppy journalism" charge as nothing more than an assertion that Moldea has written a "'bad' book." This is a convenient ploy, because it allows the dissent to analyze the dispute at a level of generality inapposite to this case. In fact, Eskenazi's assessment of *Moldea* goes to the discrete and factbound efforts of an investigative journalist, and the assessment clearly concludes that Moldea's work as a journalist is less than competent.

There is a distinction, after all, between accusing a physician of practicing "bad science," as opposed to "clumsy brain surgery." In the instant case, Eskenazi accused Moldea not of failing in some amorphous, value-laden respect such as writing style; but rather suggested that he failed, as a journalist, to present information that was accurate and that had not been aired before. What is at issue in this case is not, as the dissent says, "a general assessment of ... the quality of an author's book." We do not hold that it is possible to verify whether Moldea's work is in fact "sloppy;" but rather that this characterization rests on verifiable underlying facts.

in a "book review" rather than in a hard news story. To permit a defendant to escape liability for libel merely because defamatory remarks are published in a book review would be as simplistic as permitting an author to insulate himself or herself by merely prefacing assertions with the words "I think ..." and calling everything that followed nonactionable opinion. In other words, it would make little sense to craft a rule that permitted otherwise libelous statements to go unchecked so long as they appeared in certain sacrosanct genres. In the instant case, the injury to Moldea's professional reputation is if anything greater because Eskenazi's review appeared in a forum to which readers turn for evaluations of books. For an author, a harsh review in *The New York Times Book Review* is at least as damaging as accusations of incompetence made against an attorney or a surgeon in a legal or medical journal.

It has been suggested that, in reviews as a genre, "the object of the judgment is available to the critic's audience." *Mr. Chow of New York v. Ste. Jour Azur S.A.,* 759 F.2d 219, 228 (2d Cir.1985). This statement, which suggests some type of doctrinal exemption for reviews generally, implies that the statements of opinion in reviews are, by definition, based on revealed premises. Obviously, this cannot be: readers use reviews to decide *whether* to look at/eat/explore the underlying object of the review. That the object itself is identified in the review is not enough. More than in other contexts, the reviewer's assessment may actually influence behavior.

■ We certainly do not mean to suggest that all bad reviews are actionable. We do hold, however, that assertions that would otherwise be actionable in defamation are not transmogrified into nonactionable statements when they appear in the context of a book review. This conclusion finds strong support in the Supreme Court's decision in *Milkovich.* The statements held actionable in that case appeared in an "opinion column" in a newspaper sports section, a forum well known for spirited expressions of personal opinion, but this fact played no part in the Court's analysis. *See Milkovich,* 497 U.S. at 9, 110 S.Ct. at 2700 (noting that court below had relied on this fact in determining that article at issue was nonactionable because it was "opinion"). As explained above, *Milkovich* held that statements which are hyperbolic, satirical, or otherwise marked as evaluations not meant to be taken literally are nonactionable only when they meet the criteria established by the Supreme Court specifically addressing such portrayals.

To assert that *Interference* is "sloppy" necessarily implies that Eskenazi concluded that it is sloppy *because of* specific shortcomings he found in the book. In order for the review to be nonactionable as a matter of law, the Times must show that it offered true facts in support of its judgment that served to support its statement of opinion.

## 2. *Verifiability of Other Passages in The Times Review*

The Times review gives several examples of what Eskenazi regarded as "sloppy journalism" in *Interference,* five of which Moldea challenges in this suit. We hold that four of the five challenged passages characterize *Interference* in ways that a jury could meaningfully determine are true or false. Each of these passages is offered as an illustrative "fact" supporting the reviewer's opinion that Moldea's work is "sloppy." If a jury were to find that they are false and that Moldea had proved the other elements of his libel claim, then we hold that it could reasonably find that Moldea was libeled. Because we hold that two of the four verifiable statements cannot be deemed true *as a matter of law,* but rather must be evaluated by a jury, we remand this case for further proceedings.[7]

■ First, we find that the review's assertion that Moldea portrays a meeting be-

---

7. Given that we hold that the "sloppy journalism" attack would be libelous if the Times simply made that assertion without supporting facts, if the remainder of the review simply offers further opinions, then it still would be actionable in libel. As we noted in *White,* an unsupported opinion implying unstated provable facts can be actionable. *See White,* 909 F.2d at 522. Thus, the Times' argument that all of the statements supporting its conclusion that *Interference* is "sloppy" are nonverifiable subjective evaluations lends nothing to appellee's case.

tween Joe Namath and Lou Michaels as "sinister" is verifiable, and that a reasonable juror could conclude that it is false:

> *Mr. Moldea tells as well of Mr. Namath's 'guaranteeing' a victory in Super Bowl III shortly after a sinister meeting in a bar with a member of the opposition, Lou Michaels, the Baltimore Colts' place-kicker. The truth is that the pair almost came to blows after they both had been drinking; and Mr. Namath's well-publicized 'guarantee' came about quite innocently at a Miami Touchdown Club dinner when a fan asked him if he thought the Jets had a chance. 'We'll win. I guarantee it,' Mr. Namath replied.*

In this passage Eskenazi attempts to support his suggestion that Moldea is an incompetent journalist by describing one of the book's alleged errors—*i.e.,* by using a fact to substantiate his opinion. Moldea argues that his book plainly reveals that the Namath–Michaels meeting was innocent.[8] The clear implication of the review passage is that Moldea, either through incompetence or an intent to mislead, suggests that the meeting was "sinister." This is an essentially factual claim—either *Interference* so describes the meeting or it does not.

In his brief and during oral argument, appellee's counsel attempted to demonstrate that the disputed passages in Moldea's book do *in fact* describe a "sinister" meeting. However, arguing that the characterizations offered in the review are *correct* is not the same as contending that they are nonverifiable—indeed, it is precisely the opposite. The arguments presented by both parties as to this statement's truth or falsity make it clear that one can adduce evidence on the issue and that a jury could meaningfully decide it. Any concerns we might otherwise have that the Times could be penalized simply because its reviewer's interpretation differs from that of a jury are allayed by the fact that in order to win at trial Moldea would be required to prove not only falsity, but also malice or

fault, depending on whether he were found to be a public figure.

Given our holding that the review's characterization of Moldea's discussion is verifiable, we must next consider whether a reasonable juror could find it false. Although we express no opinion as to the truth of the review's assertion that Moldea indicates that the Namath–Michaels meeting was "sinister," we cannot hold as a matter of law that it is true. On page 197 of *Interference,* Moldea states that Michaels told him that his meeting with Namath was "quite accidental and even confrontational." On the same page Moldea quotes Michaels as saying "What we talked about had no relationship to the game," and quotes another player present at the meeting as confirming that " 'nothing technical' about the game was discussed." The only overt suggestion in the book that the meeting could even be construed as "sinister" is Moldea's statement that "[t]hose who still insist that something about the game was suspicious call attention" to it. *Interference,* at 197. Based on our reading of *Interference,* we cannot hold that the Times review's characterization of the book's depiction of the Namath–Michaels meeting could not reasonably be found to be false.

▬ Second, although it is a closer question, we also hold that the review's assertion that Moldea "revives the discredited notion" that Carroll Rosenbloom was murdered could be found to be false when read in the context of the book as a whole:

> *[Moldea] revives the discredited notion that Carroll Rosenbloom, the ornery owner of the Rams, who had a penchant for gambling, met foul play when he drowned in Florida 10 years ago.*

Moldea discusses Rosenbloom's drowning in pages 319 through 326 of *Interference,* closing his account with quoted observations from several of Rosenbloom's friends who speculate that he was murdered. However, later in his book, on page 360, Moldea states

---

8. The dissent observes that "the statements that the review offers to support its conclusion that Mr. Moldea mischaracterized the meeting as sinister, which are themselves verifiable, are not challenged by Mr. Moldea." Dissent at 1156–57. The reason Moldea does not challenge these

statements is that he *agrees* with what Eskenazi offers as "the truth" about the Namath–Michaels meeting—that it was not a "sinister" encounter. Moldea contends that he did not so portray the meeting, not that it was in fact "sinister."

that he has located previously unknown photographs taken at Rosenbloom's autopsy which he presented for inspection to "several friends within the law-enforcement community." Moldea then concludes that "In short, the evidence appears to be clear that Rosenbloom died in a tragic accident and was not murdered."

It could be said that *Interference* does in fact suggest that Rosenbloom was murdered because the book mentions his friends' suspicions of foul play. At the same time, there can be no doubt that Moldea ultimately claims that he has conclusively disproved this theory. We cannot hold as a matter of law that a reasonable juror could not find that the Times review did in fact mischaracterize *Interference*'s portrayal of this incident. The law of this circuit requires that the review "be taken as a whole, and in the sense in which it would be understood by the readers to whom it was addressed." *Afro–American Publishing,* 366 F.2d at 655. A jury could, taking into consideration the generally negative tone of the review as a whole, find that the implication intended by the "revives the discredited notion" passage was not simply that Moldea discusses a "discredited notion," but that Moldea does not reveal what Eskenazi implies is the well known truth about Rosenbloom's death. Read in this fashion, the Times review implies that Moldea is a poor journalist indeed—one who accepts versions of events that he should know already have been disproved; or, worse still, intentionally purveys "discredited notions" in an effort to suggest scandal where there is none.

■ Third, the Times review's assertion that material in *Interference* is "warmed over" is also a verifiable statement offered in support of the review's overall verdict that Moldea is a "sloppy" journalist:

> *Too bad. For there is some really hot stuff in here, albeit warmed over.*

The import of this passage is clear: Eskenazi implies that Moldea has, at some points in his book, rehashed material that has been aired before by other sources. Such a practice would, of course, reflect badly on an investigative journalist. Moldea contends that the accusation that his book contains "warmed over" material is false because *Interference* makes important new revelations. We conclude that the "warmed over" passage is verifiable; however, the text of *Interference* itself makes plain that this characterization is substantially true. The presence of *some* new material in *Interference* would not negate the review's implication that some portion of the book is old news. The Times review does not suggest that all of *Interference* is "warmed over," but merely that *"some"* of the book's revelations, though they initially seem "hot," have in fact been revealed by previous journalistic efforts.

While we cannot establish with mathematical precision how much of *Interference* the Times would be required to prove is "warmed over" in order to verify this characterization, Moldea's book reveals that at least the portrayals the review specifically suggests are rehashed have in fact been presented before, and we hold that this is enough for the Times to avoid liability for this statement. Eskenazi wrote that Moldea offered "still another recitation" of the 1958 Colts–Giants playoff. Moldea's discussion of that game quotes from a book published in 1974 which suggests that "Football Insiders" suspect that the Colts went for a touchdown in order to beat the point spread, the very issue *Interference* addresses. *See Interference* at 90 n. 1. In addition, Eskenazi dismisses suspicions that Carroll Rosenbloom might have been murdered as "discredited notions," implying that some source has previously discredited that theory. Moldea in fact writes at some length about a 1983 television special which suggested that Rosenbloom "might have been murdered," *see id.* at 358, then goes on to discuss commentaries on this special which were published in the *Chicago Tribune, Variety, Sports Illustrated,* and the *New York Times. See id.* at 360–361. By Moldea's own admission, then, his account of the controversy surrounding Rosenbloom's drowning cannot be deemed a journalistic "scoop," although, as noted above, Moldea does contend that he unearthed new information finally laying these rumors to rest.

■ Fourth, the review's statement that Moldea does not reveal "in his text" that the Baltimore Colts had one of the worst kickers

in the league is a factual claim, but because it is true it cannot be defamatory:

> [Moldea] also offers still another recitation of the 1958 playoff game between the Baltimore Colts, then owned by Rosenbloom, and the New York Giants. The Colts disdained a field-goal attempt in overtime, choosing instead to go for a touchdown after they got close to the goal line. Mr. Moldea's implication is that they wanted to win by more than three points to beat the point spread.
>
> The Colts 'again refused to send in kicker Myhra to end the game' with a field goal, [Moldea] complains. What [Moldea] doesn't state in his text is that Steve Myhra was among the worst place-kickers in the league, having missed three extra points and more than half his field-goal attempts during the season.

No reasonable juror could disagree with the above assertion. It is true that Moldea quotes the Baltimore coach in the text of *Interference* as saying "We did not have a great placekicker" and denying that he had attempted to beat the point spread by going for a touchdown, *Interference* at 90, but Moldea does not state in his text that Steve Myhra was among the worst place-kickers in the league. Rather, it is only in a footnote to his discussion of the Colts–Giants game that Moldea states that Baltimore had the second-worst field goal percentage in the NFL. *See Interference* at 444 n. 1.

■ Finally, the review's criticism of *Interference*'s description of *The Morning Telegraph* as an "inside information sheet" is not verifiable because it merely offers Eskenazi's evaluation of that publication in contrast to Moldea's, and reveals the factual bases for its disagreement:

> Mr. Moldea is obsessed, for example, with Joe Namath. [Moldea] says that, as a rookie, the New York Jets' quarterback roomed with 'Joe Hirsch, who wrote a betting line and an inside information sheet on professional sports.'
>
> Heady revelations—except that the courtly Mr. Hirsch happened to be the racing columnist and chief reporter for The Morning Telegraph (*now* The Racing Form). He still is. He never picked horses, never wrote 'an inside information sheet.' He is, in essence, the writer for the world of horse racing.

The passage offers a competing description of *The Morning Telegraph* which adequately explains the basis for the reviewer's opinion that Moldea is "sloppy" for having characterized that publication as an "inside information sheet." Although the opinion expressed in the passage might have a defamatory implication in the context of this article—that Moldea is an incompetent journalist—it is not actionable because it permits the reader to evaluate the facts upon which it is based. Moldea argues that the passage is false because *Interference* does reveal that Hirsch wrote for *The Morning Telegraph* and that the review erroneously suggests that he did not do so. While we agree that the review does not make clear that Moldea notes the exact publication for which Hirsch wrote, the real gist of the challenged passage is that Moldea inaccurately describes *The Morning Telegraph*, not that he fails to name it.

### C. The Incremental Harm Rule

■ Some of the factual evidence with which the Times review supports its assertion that *Interference* is "sloppy" is plainly true. As noted above, Eskenazi is correct that Moldea did not reveal "in his text" that Colts kicker Steve Myrha was among the worst in the NFL in 1958. In addition, Moldea does not contest the review's assertion that his book contains "several errors in spelling." We therefore must consider whether the Times can avoid potential liability on the ground that some of its factual claims are true.

This circuit has squarely rejected the argument that a false defamatory statement made among other true ones cannot be actionable because it does only "incremental harm" to a plaintiff's reputation. In *Liberty Lobby, Inc. v. Anderson*, 746 F.2d 1563, 1568 (D.C.Cir. 1984), *vacated on other grounds*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), then-Judge Scalia held that even if some of the qualities that were correctly attributed to plaintiffs "are in fact much more derogatory than the statements under challenge, the latter cannot be said to be harmless. Even the

public outcast's remaining good reputation, limited in scope though it may be, is not inconsequential."

The Supreme Court held in *Masson v. New Yorker Magazine Inc.*, —— U.S. ——, ——, 111 S.Ct. 2419, 2432, 115 L.Ed.2d 447 (1991), that the First Amendment does not preclude liability for defamatory statements that cause incremental harm to a plaintiff's reputation, though it left the states free to adopt the incremental harm doctrine if they choose to do so. On remand from the Supreme Court's decision in *Masson,* the Ninth Circuit noted that it did not think that California would adopt the incremental harm rule, and quoted this court's decision in *Liberty Lobby v. Anderson* to support its observation that the doctrine seemed simply a "bad idea." *Masson v. New Yorker Magazine Inc.*, 960 F.2d 896, 898–99 (9th Cir.1992).

In a similar vein, this court long ago held that "[p]artial truths are not necessarily even mitigating in this branch of the law, for the defamer may be the more successful when he baits the hook with truth." *Afro–American Publishing*, 366 F.2d at 655. *Afro–American Publishing* upheld a lower court's libel verdict despite the presence of true statements in the article at issue in that case. This court held that the false statements in the challenged publication "were critical in the total impact of the article," and that the article at issue must be read as a whole and in the manner it would be viewed by an average reader. *Id.*

 "Substantial truth" is, however, generally regarded as a defense to defamation. *See, e.g., Liberty Lobby v. Dow Jones*, 838 F.2d at 1296 ("Slight inaccuracies of expression are immaterial provided that the defamatory charge is true in substance.") (citing RESTATEMENT § 581A cmt. f); SMOLLA § 5.09. In the instant case, the Times cannot establish on remand that the review is nonactionable merely by proving that *some* of the factual claims it makes to support its assertion that *Interference* is "sloppy" are true. Conversely, Moldea must do more than simply establish that although the bulk

of the review's criticisms of his work are valid, it is marred by minor inaccuracies.[9] When a trial court can find as a matter of law that a challenged publication is substantially true, then it may properly grant judgment for the defendant. However, in a case of this sort, in which the truth or falsity of multiple statements are presented as questions of fact for the jury, it is the jury's province to determine whether the publication was sufficiently false so as to have defamed the plaintiff. *See Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1228 (7th Cir.1993) ("Ordinarily the question whether a defamatory work is substantially true although erroneous in some details is for the jury.").

### D. *Moldea's False Light Invasion of Privacy Claim*

Finally, we agree with Moldea's contention that the lower court applied an incorrect standard in dismissing his false light invasion of privacy claim. The District Court stated that, to recover for such a claim, a plaintiff "must show publication of *private information* which places him in a false light." *Moldea,* 793 F.Supp. at 337 (citing *Dresbach v. Doubleday & Co.*, 518 F.Supp. 1285 (D.D.C. 1981)) (emphasis added). Based on this erroneous statement of the law, the District Court dismissed Moldea's false light claim on the grounds that "the publication of over 28,000 copies of *Interference* is not a private event." *Id.* at 338.

 The law of the District of Columbia concerning false light invasion of privacy is based on the RESTATEMENT (SECOND) OF TORTS' definition of that cause of action. *See Vassiliades v. Garfinckel's*, 492 A.2d 580 (D.C.1985); *see also White*, 909 F.2d at 522. RESTATEMENT § 652E defines the tort as follows:

> One who falsely gives publicity to a matter concerning another that places the other in a false light is subject to liability to the other for invasion of his privacy, if

---

9. It is also generally the case that when a publication is found to contain only minor errors of fact, a defamation plaintiff will have a much

more difficult time proving malice or fault. *See* SMOLLA § 5.09[2].

(a) the false light in which the other was placed would be highly offensive to a reasonable person, and

(b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

Comment "a" to RESTATEMENT § 652E explains that, unlike the other privacy torts, a false light claim does not depend on the publication of private facts:

> The form of invasion of privacy covered by the rule stated in this Section does not depend on making public any facts concerning the private life of the individual. On the contrary, it is essential to the rule stated in this Section that the matter published concerning the plaintiff is not true.

■ There is a great deal of overlap between the causes of action for defamation and false light. The RESTATEMENT notes that the false light tort addresses situations in which a plaintiff is made to appear to be "otherwise than he is," when such a false characterization would also be highly offensive to a reasonable person. RESTATEMENT § 652E cmt. b. Publicity that is actionable in a false light claim generally will be actionable in defamation as well. A plaintiff may only recover on one of the two theories based on a single publication, but is free to plead them in the alternative. *See id.* We note, however, that a plaintiff may not avoid the strictures of the burdens of proof associated with defamation by resorting to a claim of false light invasion. *See Cohen v. Cowles Media Co.,* —— U.S. ——, ——, 111 S.Ct. 2513, 2519, 115 L.Ed.2d 586 (1991); *Hustler Magazine, Inc. v. Falwell,* 485 U.S. 46, 56, 108 S.Ct. 876, 882, 99 L.Ed.2d 41 (1988).

The District Court erred in requiring Moldea to show that the Times had publicized private facts concerning him. We therefore remand Moldea's false light claim for further proceedings.

## III. CONCLUSION

For the reasons discussed above, the judgment of the District Court is reversed and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

## APPENDIX

From *The New York Times Book Review,* September 3, 1989, page 8:

**Unsportsmanlike Conduct?**

**by Gerald Eskenazi**

(Gerald Eskenazi, a sportswriter for the *New York Times,* is currently working with Carl Yastrzemski on his autobiography)

First, I've got to admit a tangled financial connection to the National Football League. My wife's first cousin married a psychiatrist whose father sold his plumbing business to a company that eventually became Warner Communications. And the owners of several football teams have a piece of Warner.

Is that clear?

Now you understand the kind of crazy-quilt tie-ins Dan E. Moldea makes in "Interference" to explain how organized crime and the N.F.L. are cozy.

Of course, Mr. Moldea, whose previous books include "Dark Victory: Ronald Reagan, MCA and the Mob," has a built-in safeguard if he is questioned about his tactics or sources or conclusions: the league, he claims, will "send its front line of defense, the loyal sportswriters, to attack the messenger." In other words, he has shielded himself in advance from criticism by people like me.

Too bad. For there is some really hot stuff in here, albeit warmed over. His examination of the 1980 Super Bowl ticket-selling scandal involving Georgia Frontiere, the multimillionaire owner of the Los Angeles Rams, and her husband, Dominic, who went to prison for tax evasion, shows that greed has no bottom line. And he raises truly disturbing questions about connections between some owners and friends who may be mob-connected, as well as about newspapers and television shows that regularly pander to people who bet on sports events. But there is too much sloppy journalism to trust the bulk of this book's 512 pages—including its whopping 64 pages of notes.

Mr. Moldea is obsessed, for example, with Joe Namath. He says that, as a rookie, the New York Jets' quarterback roomed with "Joe Hirsch, who wrote a betting line and an inside information sheet on professional sports."

Heady revelations—except that the courtly Mr. Hirsch happened to be the racing columnist and chief reporter for The Morning Telegraph (now The Racing Form). He still is. He never picked horses, never wrote "an inside information sheet." He is, in essence, the writer for the world of horse racing.

Mr. Moldea tells as well of Mr. Namath's "guaranteeing" a victory in Super Bowl III shortly after a sinister meeting in a bar with a member of the opposition, Lou Michaels, the Baltimore Colts' place-kicker. The truth is that the pair almost came to blows after they both had been drinking; and Mr. Namath's well-publicized "guarantee" came about quite innocently at a Miami Touchdown Club dinner when a fan asked him if he thought the Jets had a chance. "We'll win. I guarantee it," Mr. Namath replied.

Mr. Moldea claims to be a football fan, yet his naïveté is apparent, as is his ignorance of basic sports knowledge, while several errors in spelling call into question his diligence at simple fact-checking. He misspells the name of a Heisman Trophy winner (Howard Cassady), the top thoroughbred trainer in the United States (D. Wayne Lukas) and the president of the New York Jets (Steve Gutman).

He revives the discredited notion that Carroll Rosenbloom, the ornery owner of the Rams, who had a penchant for gambling, met foul play when he drowned in Florida 10 years ago. He also offers still another recitation of the 1958 playoff game between the Baltimore Colts, then owned by Rosenbloom, and the New York Giants. The Colts disdained a field-goal attempt in overtime, choosing instead to go for a touchdown after they got close to the goal line. Mr. Moldea's implication is that they wanted to win by more than three points to beat the point spread.

The Colts "again refused to send in kicker Myhra to end the game" with a field goal, he complains. What he doesn't state in his text is that Steve Myhra was among the worst place-kickers in the league, having missed three extra points and more than half his field-goal attempts during the season.

There may well be some insidious connection between the wise guys and the N.F.L. Then again, there may not. "Interference," with its errors and unfounded insinuations, does not settle the issue. Mr. Moldea raises the questions, but has blunted his own sword of truth.

MIKVA, Chief Judge, dissenting:

## I. INTRODUCTION

When the Supreme Court found the dichotomy between fact and opinion "artificial" in *Milkovich v. Lorain Journal*, 497 U.S. 1, 19, 110 S.Ct. 2695, 2705, 111 L.Ed.2d 1 (1990), it aired out a cloudy area of First Amendment law in a way that has been helpful and relatively easy for other courts to manage. I am concerned that the extra dimension placed on *Milkovich* by today's decision causes some troublesome surgery on the First Amendment and its impact on artistic expression. Analogizing a book review that complains that the author of the book under review has engaged in "too much sloppy journalism" to a charge that a brain surgeon has "clumsy hands", Maj.Op. at 1145, is to equate a piano recital with medical malpractice.

The First Amendment literature has always recognized a sharp distinction between communications intended to inform and those seeking to appeal to the artistic senses. Musical criticism, for one, is rife with epithets denigrating efforts by various composers, singers, violinists, and saxophone players. None of them are conceived to involve the stuff of defamation. Even the late President Truman challenged the criticism of his daughter's singing with some zingers of his own, but not by claims of defamation. Painters, sculptors, architects, designers, playwrights, poets, movie makers, and fiction writers—all of them have had sharp comments made about their work. To say that every one of those comments is actionable as

defamation because they could be shown to "rest upon provable, albeit unstated, defamatory facts," is to open up the entire arena of artistic criticism to mass defamation suits. If the statement that Mr. Moldea wrote a sloppy book is defamatory, so would be a statement that Bette Midler wore a sloppy dress, or that Oliver Stone made a sloppy film, or that Itzak Perlman had a sloppy technique, or that Lincoln Steffens played fast and loose with his analyses of reform politicians. I have no doubt that many people reading such derogatory criticism of their favorite artists might have strong feelings about the criticism. I have grave doubt that defamation suits should be used as the arbiter of such literary and artistic tastes.

Admittedly, book reviewing is not quite as "clearly subjective" as other forms of artistic criticism. There are statements about a book that are more capable of being proven false than similar statements about a Chagall window, or even a Shaw play. But I do not know how courts could ever check the slide down the slope that the majority opinion creates today. The standard of "sloppiness" in this context is not verifiable, no matter what examples are used to sustain or reject the charge.

## II. DISCUSSION

### A. *Historical Protection of Artistic and Literary Criticism.*

Potentially defamatory statements of opinion appearing in reviews have long been afforded significant protection from defamation liability, first by the common law privilege of fair comment and, more recently, by First Amendment doctrine. *See, e.g.,* RODNEY A. SMOLLA, LAW OF DEFAMATION § 6.12[7] (1993) ("As a general principle, authors, journalists, and artists invite criticism of their work product, and … the mainstream position is clearly to construe such criticism as opinion or fair comment."). *Milkovich,* while declining to carve out a distinct privilege for all statements that could be labeled "opinion," did not significantly alter these earlier protections. What *Milkovich* did, simply, was shift the inquiry away from whether a statement could be said to be "opinion" and towards whether the statement is verifiable.

Accordingly, "[b]oth as guides to the 'fact v. non-fact' distinction created in *Milkovich,* and to the future evolution of state law protection, the rich body of jurisprudence developed by lower courts during the last two decades under the rubric of the 'opinion' doctrine remains alive and well." SMOLLA, *supra* § 6.03[7][d].

The historical safeguards afforded reviews stem from the fact that in the realms of artistic, literary, and culinary endeavors, there are few ready yardsticks with which to measure the opinions of critics. Moreover, readers approach literary and artistic criticism with the expectation that the opinions they express are not meant as objective statements or implications of fact. Rather, "[c]ertain formats—editorials, reviews, political cartoons, letters to the editor—signal the reader to anticipate a departure from what is actually known by the author as fact." *Milkovich, supra,* at 32, 110 S.Ct. at 2712 (Brennan, J., dissenting). The public nature of the work under review allows readers to arrive at their own opinions.

The current constitutional protection of nonverifiable statements of opinion can be traced to the common law privilege of fair comment. Due to a concern that defamation suits would stifle valuable public discourse, the common law recognized as an affirmative defense to a defamation action " 'the honest expression of opinion on matters of legitimate public interest when based upon a true or privileged statement of fact.' " *Milkovich, supra,* at 13, 110 S.Ct. at 2702, *quoting* 1 F. Harper & F. James, Law of Torts § 5.28 (1956). In general, comment was privileged when it "concerned a matter of public concern, was upon true or privileged facts, represented the actual opinion of the speaker, and was not made solely for the purpose of causing harm." *Id.* at 10–11, 110 S.Ct. at 2702, *citing Restatement of Torts* § 606 (1938). Underlying the privilege was a desire to protect "intuitive, evaluative statements that could not be proved either true or false by the rigorous deductive reasoning of the judicial process." Mark A. Franklin & Daniel J. Bussel, *The Plaintiff's Burden in Defamation: Awareness and Falsity,* 25 WM. & MARY L.REV. 825, 871 (1984).

Critical reviews of art and literature fit neatly within the fair comment privilege, and numerous critics have successfully employed it to defend defamation actions. Generally, such reviews are based on true facts that are either stated in the review itself or readily available to the reader by reference to the work, are offered without malice, and reflect the honest and nonverifiable opinion of the reviewer. In *Fisher v. Washington Post*, 212 A.2d 335 (D.C.1965), for instance, the privilege was applied to a review of a gallery exposition that criticized the art as being "so badly hung among commercial paintings that what quality they might have is completely destroyed." *Id.* at 336. And in *Sullivan v. Meyer*, 141 F.2d 21 (D.C.Cir.1944), this court ruled that it was fair comment for a journalist to characterize the plaintiff as the "author of a defeatist, anti-Jewish book."

Beginning with the Supreme Court's decision in *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the nature of the fair comment privilege began to change. By stating that the Constitution requires "that a defense of fair comment must be afforded for honest expressions of opinion based upon privileged, as well as true, statements of fact," *Id.* at 292 n. 30, 84 S.Ct. at 732 n. 30, the Court for the first time hinted at a constitutional basis for protecting statements of opinion. The Court reaffirmed this "fact-opinion" dichotomy in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), where it stated in dicta that

> [u]nder the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact.

*Id.* at 339, 94 S.Ct. at 3006. *Gertz* thus "elevated to constitutional principle the distinction between fact and opinion, which had formed the basis of the doctrine of fair comment." *Ollman v. Evans*, 750 F.2d 970 (D.C.Cir.) *(en banc) cert. denied*, 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985). Prior to *Milkovich*, lower courts struggled to apply the somewhat illusory distinction between fact and opinion announced in *Gertz*. In *Ollman v. Evans, supra*, this court attempted to provide some degree of guidance by setting out a flexible test for distinguishing fact from opinion that took into account several factors, including the common meaning of the language used, the degree to which the statement is verifiable, the context in which the statement occurred, and the broader social context in which the statement fits. *Milkovich* implicitly rejected *Ollman*'s "totality of the circumstances" test in favor of a single inquiry into whether the alleged defamatory statement is verifiable. The factors set forth in *Ollman*—common meaning, context—remain relevant, but only to the extent they bear on the verifiability of the statement.

The *Milkovich* Court thus simplified the task of identifying protected opinion by singling out verifiability as the sole factor upon which courts should focus. But as with fact and opinion, the line separating verifiable from non-verifiable statements is not always self-evident. As one commentator has noted, "[v]erifiability is not a property that either does or does not obtain. Rather, it is a property that may be present in varying degrees." Frederick F. Schauer, *Language, Truth, and the First Amendment: An Essay in Memory of Harry Canter*, 64 VA.L.REV. 263, 279 (1978).

### B. "Too Much Sloppy Journalism."

The primary statement before us confirms the point. "Too sloppy" might be taken by some to mean that the book is full of specific factual inaccuracies, a charge the plaintiff could disprove by providing clear support for the statements found in the book. Others, however, might interpret the statement simply to imply that the author wrote a "bad" book, a clearly subjective and non-provable assessment. In my view, "too much sloppy journalism" contained in a book review lies somewhere between those two poles, but far too close to the nonverifiable end of the spectrum to warrant defamation liability.

Applied to another profession or contained in another context, a charge of sloppiness might indeed be actionable. A claim that a "sloppy" doctor botched an operation, for

instance, would be susceptible to verification by reference to the patient's recovery, the overall record of the doctor, or some other objective measurement. Or if a product were said to be manufactured in a "sloppy" (or perhaps more aptly, "shoddy") manner, the producer might be able to prove otherwise by demonstrating, for example, that the product conforms to accepted industry specifications or has an acceptably low defect rate.

However, the inherent imprecision of the phrase "too sloppy" when coupled with its use to describe a book firmly pushes the statement at issue under the protective umbrella of non-verifiable opinion. First, the common understanding of the word "sloppy" as used to describe a piece of writing is one that challenges objective verification. The dictionary defines "sloppy" in this context as "*carelessly* put together or performed; lacking *sound* construction." *New Webster Encyclopedic Dictionary of the English Language* (7th ed. 1971) (emphasis added). Words denoting concepts such as carelessness and soundness, though sometimes possible to objectify, are typically evaluative judgments that will differ from person to person. What constitutes sloppiness? How sloppy is too sloppy? Should spelling errors suffice or are more grievous lapses in research necessary? In whose eyes? Because of the subjective nature of the term, the recipient of a charge of sloppiness usually will be hard-pressed to disprove that insufficient care was given to the work.

Second, the overall tenor of the review suggests that the reviewer was not as much concerned with specific misstatements of objective and verifiable facts as he was with what he saw as Mr. Moldea's fundamental failure to prove the thesis of the book—his failure to produce a "smoking gun" linking the NFL to organized crime. At bottom, the review expresses a uniquely subjective evaluation of the *quality* of *Interference*. While another reader might disagree that Mr. Moldea fumbled the ball, it is difficult to see how one could *prove* the reviewer's assessment wrong as it is based largely on his particular tastes and standards. Furthermore, because the burden of proving that an allegedly defamatory statement is false lies with the

plaintiff, defendants should prevail in cases like this where the verifiability of the statements at issue is doubtful. *See* SMOLLA, *supra*, § 6.07[2]. Accordingly, the phrase "too much sloppy journalism" used in a book review to describe one's writing style or research methods is simply too subjective to be verified and therefore should be protected under *Milkovich*.

This conclusion is supported, I think, not only by the vintage fair comment cases discussed above, but also by recent First Amendment precedent. In *White v. Fraternal Order of Police*, 909 F.2d 512 (D.C.Cir. 1990), the defamatory implication that the police officer had tested positive for illegal drugs and engaged in bribery was actionable because clearly the charge could be proven true or false. In *Milkovich* itself, the implication that the wrestling coach committed perjury was similarly subject to verification. The statements involved in those cases, though cloaked as opinion, have a factual basis. Either the coach perjured himself or he didn't. Either Detective White tested positive or not. There is little room for interpretation. My understanding of the *Milkovich* principle is that these types of factual assertions should not escape defamation liability simply because they are prefaced by the words "in my opinion."

That concern is not present in cases, like this one, that involve subjective evaluations of a plaintiff's performance, particularly when they appear in a review. In *Cole v. Westinghouse Broadcasting Co., Inc.*, 386 Mass. 303, 435 N.E.2d 1021 (1982), for instance, the Supreme Judicial Court of Massachusetts held nonactionable statements remarkably similar to those at issue here. In that case, a terminated television reporter brought a defamation action against his former employer for issuing a statement that the newscaster's firing was a result of his "sloppy and irresponsible reporting." Holding that the statement could not form the basis of a defamation action, the court stressed its subjective nature:

... [T]he statements made by [the defendant] can only be viewed as expressions of opinion regarding Cole's reporting abilities. Whether a reporter is sloppy and

irresponsible with bad techniques is a matter of opinion. *The meaning of these statements is imprecise and open to speculation. They cannot be characterized as assertions of fact. They cannot be proved false.*

*Id.* 435 N.E.2d at 1027 (emphasis added).

In *Stuart v. Gambling Times, Inc.*, 534 F.Supp. 170 (D.N.J.1982), a book review of the plaintiff's gaming manual charged that its publication and sale was "the # 1 fraud ever perpetrated upon the gambling public." The court held that in the context of a book review, the statement could not reasonably be understood as actually accusing the author of fraud (a verifiable fact), but rather, was simply the opinion of the reviewer. *Id.* at 172.

Likewise, in *Mr. Chow v. Ste. Jour Azur*, 759 F.2d 219 (2d Cir.1985), a defamation action involving an unfavorable review of the food and service offered by a Chinese restaurant, the Second Circuit ruled that five of six challenged assertions in the review were protected as non-verifiable statements of opinion. The only statement in the review that the court viewed as verifiable concerned the number of dishes in which the restaurant served its Peking Duck. *Id.* at 226–27. As to the other statements, the court noted that "an average reader approaches a review with the knowledge that it contains only one person's views...." *Id.* at 227–28. As a result, the court found the statements "incapable of being proved false." *Id.* at 229.

Another analog to this case might be the traditional "Monday morning quarterback" column in the sports section of the newspaper. If the local columnist calls for the head coach's resignation for incompetent play-calling, the reader reasonably should understand the column to reflect the personal opinion of the sportswriter. Whether ninety-nine out of a hundred readers agree or disagree with the assessment is immaterial. The opinion is non-verifiable because it so clearly represents the subjective interpretation of one person. The case would be different if the columnist expressed an opinion, without stating its basis, that the coach was drunk, paid off the referees, or failed to show up for practice all week. Each of these opinions

connotes facts that can be proved true or false. A general assessment of a coach's ability—or the quality of an author's book—does not.

I do not advocate the creation of a wholesale defamation privilege for statements appearing in literary or artistic criticism. My colleagues are correct, of course, that it would be unwise "to craft a rule that permitted otherwise libelous statements to go unchecked so long as they appeared in certain sacrosanct genres." Maj.Op. at 1146. The majority is equally unwise, however, to ignore altogether the effect of the communicative vehicle upon the audience. *See Id.* ("... our analysis of this case is not altered by the fact that the challenged statements appeared in a 'book review.' "). As explained above, this view runs contrary to a long history of defamation jurisprudence which recognizes that reviews are generally offered, and reasonably received, as statements of subjective, non-verifiable opinion rather than fact. Reviewers should escape defamation liability unless they attempt to smuggle defamatory and verifiable facts about the author under the guise of criticism. Such is not the case here.

### C. *The Secondary Statements.*

As for the other passages challenged by Mr. Moldea, the two that cause the majority the most concern are those regarding the alleged "sinister" meeting between Joe Namath and Lou Michaels and the "revival" of allegations that foul play was involved in the death of Rams' owner Carroll Rosenbloom.

1. *The "sinister" statement.* In my view, the review's implication that Mr. Moldea painted the Namath–Michaels meeting as "sinister" is protected, non-verifiable opinion. The dictionary defines "sinister" as it is used this context as "presaging ill-fortune or trouble." *Webster's Ninth New Collegiate Dictionary* (1984). The issue here is not whether the meeting in fact "presaged trouble"— the fixing of Superbowl III—but whether Mr. Moldea fairly can be said to have given readers that impression. The reviewer expressed the opinion that he did. This conclusion, the basis of which is readily available to all, is the reviewer's and his alone. As such,

it cannot be proven false, just as an opinion that a person has a "sinister" disposition or "sinister" facial expression cannot be proven false. Had the review stated that Mr. Moldea mischaracterized the meeting by *using* the word sinister, then such an allegation could be proven false. But while my colleagues are correct that the "sinister" characterization is open to debate, debatable does not mean verifiable. Moreover, the statements that the review offers to support its conclusion that Mr. Moldea mischaracterized the meeting as sinister, which are themselves verifiable, are not challenged by Mr. Moldea.

2. *The Rosenbloom allegation.* The Rosenbloom allegation also is not independently actionable. It is either supported by reference to the book or non-verifiable opinion depending upon what meaning one gives to the word "revive." The common understanding of "revive" as it is used in the review is to "bring back" or "renew in the mind or memory." *See Webster's Ninth New Collegiate Dictionary* (1984). In other words, to revive is simply to "recall" or "discuss anew." Therefore, unlike the charges of "sloppiness" or "sinister" behavior, which involve qualitative assessments, the statement that Mr. Moldea "revived a discredited notion" is largely value-neutral. It can be verified by looking to the book itself. Doing so, however, reveals that Mr. Moldea does in fact "bring back" or "discuss anew" admittedly old accusations surrounding Mr. Rosenbloom's death. *See, e.g., Interference* at 324 ("In the wake of Rosenbloom's funeral, numerous questions arose about the circumstances of his death, which have challenged the contention that he drowned by accident. It was suggested by some that Rosenbloom might have been murdered.... Could Rosenbloom's death have been anything but an accidental drowning? If it was not, there was a whole cast of characters who would have had the means, opportunity, and motive."); at 325 (Nevertheless, rumors of foul play persisted."). In light of these passages, the review's statement that Mr. Moldea "revived" the accusations is patently accurate and thus cannot be the basis for defamation liability.

Mr. Moldea contends that by saying that he "revived" the Rosenbloom allegations, the review implies that Mr. Moldea actually subscribes to them, when in fact he acknowledges in the book that the allegations have been discredited. But even if we were to take "revive" to mean "to dignify or credit" (or if the review used those exact words), I am still not convinced that the statement would be actionable because, like the "sinister" characterization, it is based not on provable facts but on an non-verifiable interpretation of one reviewer. We may disagree with that interpretation upon reading the book, but we cannot prove it false.

### III. CONCLUSION

If Mr. Moldea takes issue with the *New York Times'* characterization of his book, his remedy should not lie in a defamation suit. He should rely instead on other reviewers, and the book itself, to prove his work worthy of its claims. Today's holding, I fear, absolves Mr. Moldea and others of that responsibility and may significantly affect the freedom with which reviewers go about their jobs. Fear of legal reprisal threatens to cause reviewers to retreat to rhetorical excess instead of explaining their gripe and attempting to support it by reference to the work under review. Such a result would chill the informative and lively public discourse that frequently accompanies the publication of an influential book.

The current controversy that surrounds a review of Catharine MacKinnon's *Only Words* is a case in point: often the review—positive or negative—succeeds in inspiring discussion and emotion over the relevant subject matter to a greater degree than the work itself. *See David Streitfeld, Rape by the Written Word?: Book Review Sparks Pornography Debate*, WASH. POST, Jan. 4, 1994 at C1. For these reasons, ready imputation of defamatory factual assertions in artistic and literary reviews, rather than protecting the writers and artists, actually strikes me as dangerous to their collected reputations and no service to connoisseurs of criticism.

The reviewing of books is an art form almost as old as civilization. The more im-

portant the book, the more controversial the reviews. Courts should be most hesitant to assume an arbiter's role in this most delicate area of First Amendment speech. While the designation of speech as a "book review" should not automatically exempt it from the libel laws, any more than the "opinion" label enshrines other speech, the "sloppiness" of the reviewer's work should be left to the readers to determine, rather than for judges or juries to ordain. I would uphold the district court's grant of summary judgment in favor of the *Times*.